

# NUMBER 13-19-00378-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**THE PORT OF CORPUS CHRISTI, LP,**                                          **Appellant,**

**v.**

**THE PORT OF CORPUS CHRISTI
AUTHORITY OF NUECES COUNTY,**                                          **Appellee.**

---

**On appeal from the County Court at Law No. 4
of Nueces County, Texas.**

---

# MEMORANDUM OPINION

**Before Justices Benavides, Hinojosa, and Tijerina
Memorandum Opinion by Justice Hinojosa**

Appellee The Port of Corpus Christi Authority of Nueces County (POCC) sued appellant The Port of Corpus Christi, LP (TPCC) for common law service-mark infringement and injury to business reputation and dilution under § 16.103 of the Texas Business and Commerce Code. *See* TEX. BUS. & COM. CODE ANN. § 16.103. TPCC

answered suit and filed several counterclaims. POCC filed a plea to the jurisdiction seeking to dismiss TPCC's counterclaims, which the trial court granted. In three issues, which we treat as two, TPCC argues the trial court erred in: (1) granting POCC's plea to the jurisdiction; and (2) denying TPCC jurisdictional discovery and a continuance of the jurisdictional hearing. We vacate in part, affirm in part, and reverse and remand in part.

## I. BACKGROUND

### A. POCC Sues TPCC

POCC is a political subdivision of the State of Texas and has been operating as a navigation district under article XVI, § 59 of the Texas Constitution since its formation in 1922. *See* TEX. CONST. art. XVI, § 59. TPCC is a limited partnership principally owned and controlled by Kenneth Berry. POCC filed the instant suit against TPCC complaining of TPCC's use of POCC's service marks. According to its live petition, POCC currently operates and manages the Corpus Christi Ship Channel and the La Quinta Ship Channel. POCC claims "strong common law rights" in the following service marks: "The Port of Corpus Christi," "Port of Corpus Christi," and "Port Corpus Christi." POCC has spent "millions of dollars" to promote its services under these service marks.

On January 31, 2014, TPCC filed a certificate of formation with the SOS to form a limited partnership under the name "The Port of Corpus Christi, LP." A representative for the SOS later notified TPCC that the name "The Port of Corpus Christi falsely implies a governmental affiliation" and requested that TPCC amend its certificate of formation, but TPCC did not comply with the request. On June 29, 2015, POCC registered two service marks containing "Port Corpus Christi" with the Texas Secretary of State (SOS). POCC

2

registered an additional service mark containing that name on October 23, 2015.

POCC alleges that TPCC's use of the name "The Port of Corpus Christi, LP" has caused dilution of its service marks and "falsely portrays [TPCC's] commercial endeavors as affiliated with [POCC's] commercial activities[.]" Through its suit, POCC seeks injunctive relief and damages.

## B.    TPCC's Counterclaims

TPCC answered suit and filed several counterclaims against POCC. TPCC's claims primarily focus on the legality of POCC's Memorandum of Understanding (MOU) and Lease Agreement (Lease[1]) with the Carlyle Group and its subsidiary Lone Star Ports (collectively Carlyle). The agreements concern POCC's development of a crude oil export terminal on Harbor Island (Harbor Island Project), property owned by POCC. TPCC claims that POCC misappropriated TPCC's confidential plans for a similar development on nearby Berry Island. TPCC alleges that POCC violated the Texas Open Meetings Act (TOMA) by planning the Harbor Island Project and finalizing formal agreements without adequate public disclosure. TPCC further alleges that POCC's agreements with Carlyle violate the public disclosure and competitive bidding requirements of the Public and Private Facilities Infrastructure Act (PPFIA), *see* TEX. GOV'T CODE ANN. §§ 2267.001–.066, and the Texas Water Code. *See* TEX. WATER CODE ANN. §§ 60.401–.414. TPCC also claims that POCC denied TPCC's request for pipeline easements across POCC's property to stifle TPCC's competing development. Finally, TPCC claims that POCC

---

[1] As discussed below, TPCC disagrees with POCC's assertion that the final agreement with Carlyle is a lease. However, we will refer to the agreement as the Lease to avoid confusion as that is how it is designated throughout the record.

3

breached an agreement with Berry to sell Harbor Island "on a sealed bid basis or through a broker."

TPCC brings claims for violations of TOMA, the PPFIA, the Water Code, the Public Information Act, the Takings Clause, and the Texas Constitutional prohibition against delegation of governmental authority to a private entity. TPCC also alleges claims for breach of contract and business disparagement. TPCC further pleads a § 1983 claim for violations of the Equal Protection and Due Process clauses of the United States Constitution. *See* 42 U.S.C.A. § 1983. Finally, TPCC brings an *ultra vires* action against the POCC commissioners for acting without legal authority in connection with the Harbor Island Project. TPCC seeks declaratory and injunctive relief, damages, and attorney's fees.

### C.    Plea to the Jurisdiction

POCC filed a plea to the jurisdiction on the grounds of governmental immunity, standing, and mootness. POCC challenged the sufficiency of TPCC's pleadings while also presenting evidence which purportedly negated jurisdiction. POCC's immunity argument was two-fold. First, POCC argued that TPCC's counterclaims did not fall within the *Reata* scope-of-immunity rule because the claims were not germane to nor did they offset POCC's claims. *See Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371 (Tex. 2006). Second, POCC argued that TPCC's claims either failed to invoke a statutory waiver of immunity or were not supported by the jurisdictional record. POCC's plea relied on the following evidence: (1) the MOU between POCC and Carlyle executed by POCC's Chief Executive Officer, Sean Strawbridge; (2) affidavits of Strawbridge and POCC Chief

4

Financial Officer, Kent Britton; (3) a POCC open meeting agenda memorandum describing the finalized Lease with Carlyle; (4) a Texas Attorney General Opinion concerning TPCC's Public Information Act request; (5) POCC open meeting notices and minutes; (6) a POCC resolution authorizing a POCC executive to negotiate on behalf of POCC; and (7) POCC's PPFIA guidelines.

TPCC filed a response supported by the following evidence: (1) the sworn declaration of attorney Jennifer S. Riggs opining as to the nature of the Lease and to whether POCC's agenda notices comply with TOMA; (2) the sworn declaration of Berry; (3) POCC correspondence to Berry; (4) the MOU; (5) correspondence between the POCC and the Army Corps of Engineers concerning the Harbor Island Project; (6) correspondence from POCC to Berry concerning the sale of Harbor Island; (7) POCC and Carlyle press releases discussing the Harbor Island Project; (8) POCC open meeting agenda notices and minutes; (9) POCC presentation referencing its partnership with Carlyle; and (10) POCC guidelines, codes, and operating rules.

## D.    Jurisdictional Record

In a letter dated February 3, 2014, to Berry,[2] POCC's then CEO John P. Larue informed Berry in relevant part that "If [POCC] decides to put the [Harbor Island Property] up for sale, it will do so on a sealed bid basis or through a broker." TPCC's breach of contract action is premised on POCC's alleged sale of Harbor Island to Carlyle in a manner inconsistent with this letter. POCC maintains that it still owns the island and its agreement with Carlyle constitutes a lease.

---

[2] The letter was addressed to "Mr. Kenneth L. Berry" with "The Berry Company." There is no reference in the letter to the entity TPCC.

The first public notice concerning the Harbor Island Project appears in POCC's

October 25, 2018 agenda notice:

**6.    Recess Open Meeting and Convene Executive Session** - *The Port Commissioners will deliberate the purchase, exchange, lease or value of real property in executive session only if deliberation in an open meeting would have a detrimental effect on [POCC's] position in negotiations with a third person.*

6a. The Commission will go into executive session pursuant to § 551.072 of the Texas Government Code to deliberate leasing certain [POCC] real property in Nueces County.

**7.    Reconvene Open Meeting and Resume Regular Agenda**

7a.    The Commission may authorize the Chief Executive Officer to execute a Memorandum of Understanding or similar agreement with a third-party that has expressed interest in leasing certain [POCC] land in Nueces County.

The minutes for the meeting provided that "No action was taken on agenda item 7a."

However, on October 29, 2018, POCC and Carlyle issued the following joint press

release:

[POCC] and [Carlyle] Agree to Develop Major Crude Oil Export Terminal on Harbor Island

- Project would create first onshore location in the U.S. Gulf capable of servicing fully-laden Very Large Crude Carriers

- Contemplated venture creates a new Partnership where both [POCC] and [Carlyle] would jointly fund the development of the safest, most environmentally friendly marine terminal capable of handling the largest crude vessels.

- Thousands of direct and indirect jobs and billions in incremental economic activity would be generated for the state of Texas and the United States

- Incremental exports through the facility could reduce the national trade deficit by up to $50 billion annually

6

Corpus Christi, TX, USA – Today [POCC] announced it has entered into an agreement (the "Agreement") with [Carlyle] to work exclusively to develop a world-class crude oil export terminal on Harbor Island (the "Terminal"), connecting growing crude oil production in the United States with global markets. The Terminal would be the first onshore location in the U.S. capable of providing export service to fully-laden Very Large Crude Carriers ("VLCCs") and would further [POCC's] position as the preeminent global crude oil export hub.

. . . .

Under the terms of the Agreement, [POCC] will work exclusively with Carlyle to bring together world-class oil producers, marketers, pipeline operators and marine terminal operators to ensure a significant portion of the new oil production in Texas will have a reliable gateway to international markets. As part of the Agreement, Carlyle agreed to lead the construction and ongoing operations of the Terminal on an exclusive basis. Carlyle also agreed that it would arrange for a private funding solution for a dredging project to bring fully-laden VLCCs to Harbor Island (at least a 75-foot main channel depth).

Construction of the Terminal would require no capital outlay from local taxpayers. Under the terms of the Agreement, [POCC] will realize significant regular rental payments, volume-based tariff income, land grants and other proceeds that will help [POCC] fund other aspects of its operations. The Terminal is expected to be operational in late 2020. Carlyle's equity for this investment will come from its Global Infrastructure Fund.

The Terminal would include the development of at least two loading docks on Harbor Island as well as crude oil tank storage inland across Redfish Bay on land secured by Carlyle, enhancing operational flexibility while reducing the facility's footprint on Harbor Island itself.

The Project is subject to agreement on definitive documentation between the parties, satisfactory completion of due diligence and final approval from [Carlyle.]

In the press release, Strawbridge is quoted as describing the relationship with Carlyle as a partnership. Strawbridge testified by affidavit that the agreement in question was an MOU that was "part of on-going negotiations with [Carlyle] and contains confidential

7

business information." Britton similarly testified that the MOU's purpose was "to investigate whether a definitive agreement could be reached with respect to [Harbor Island]."

The MOU, which was filed under seal in the trial court, generally details POCC and Carlyle's commitment to develop a "commercial arrangement" for the development of a crude oil export terminal on Harbor Island. The MOU provided that Carlyle would be responsible for marketing, development, construction, and facility management for the project. The contemplated final agreement would purportedly provide POCC substantial income from the project.

In a November 7, 2018 "State of the Port" presentation, POCC described the relationship with Carlyle as follows: "[POCC] and [Carlyle] have partnered to develop a major crude oil export terminal on Harbor Island. . . . The venture creates a new Public Private Partnership (P3) where both [POCC and Carlyle] jointly fund the development of the safest, most environmentally friendly marine terminal capable of handling the largest crude vessels."

A March 19, 2019 POCC open meeting notice indicated that POCC and Carlyle negotiated a final agreement, subject to the approval of POCC commissioners. The notice described the final agreement as a lease:

**10. Open Agenda**

> 10.a.  Approve a Lease Agreement for up to 50 years with [Carlyle] for land on Harbor Island related to marine terminal and associated facilities.

POCC took no action on the agenda item, but it provided identical notice for agenda item

6a in its subsequent March 28 meeting notice. The minutes for the March 28 meeting show that the Lease was approved by the POCC commissioners:

> **6a. _Lease Agreement with_ [Carlyle]**: Staff recommended approval of a Lease Agreement for up to 50 years with [Carlyle] for land on Harbor Island related to marine terminal and associated facilities. After staff's presentation, Mr. Bowers moved the adoption of the following Resolution and Mr. Squires seconded the motion:
>
> **RESOLUTION APPROVING A LEASE AGREEMENT BETWEEN [POCC], AS LANDLORD, AND [CARLYLE], AS LESSEE, FOR 200 ACRES OF LAND ON HARBOR ISLAND TO BE USED AS A CRUDE OIL EXPORT TERMINAL**
>
> WHEREAS, a lease agreement for up to fifty (50) years between the [POCC] as lessor, and [Carlyle] as lessee (the "Lease Agreement"), has been presented to [POCC's commissioners] for consideration and approval at this meeting; and
>
> WHEREAS, under the terms of the Lease Agreement, [POCC] will lease 200 acres of its land on Harbor Island to [Carlyle] (the "Leased Premises") for the development of a crude oil export terminal thereon; and
>
> WHEREAS, Sections 60.101, 60.120 and 62.107 of the Texas Water Code authorize [POCC] to make long-term leases of its land in connection with and for the purpose of the industrial and business development of [POCC's] property and waterways and in aid of navigation related commerce in [POCC's] ports and on its waterways, and the operation and industrial and business development of ports and waterways are a public purpose and a matter of public necessity; and
>
> WHEREAS, the Port Commission, acting on behalf of [POCC], wishes to lease the Leased Premises to [Carlyle] on a long-term basis in connection with the industrial and business development of [POCC] property and waterways and for the purposes and in the manner more particularly described in the Lease Agreement; and
>
> WHEREAS, the Port Commission desires to adopt this Resolution to evidence it approval of the Lease Agreement;
>
> . . . .
>
> **_Action_**: The members of the Commission present at the meeting

unanimously adopted the foregoing:

**RESOLUTION APPROVING A LEASE AGREEMENT BETWEEN
[POCC], AS LANDLORD, AND [CARLYLE], AS LESSEE,
FOR 200 ACRES OF LAND ON HARBOR ISLAND
TO BE USED AS A CRUDE OIL EXPORT TERMINAL**

Twenty-two individuals spoke at the March 28 meeting in opposition to the Lease, while five individuals spoke in favor of the Lease. The Lease was not filed in the trial court.[3] However, a memorandum by Strawbridge in support of the agenda item describes the Lease as follows:

> **SUMMARY**: Staff recommends approval of a long term (50 year) lease agreement with [Carlyle] for approximately 200 acres of land on the north side of the Corpus Christi Ship Channel Inner Basin, to construct, operate, and maintain a marine terminal for loading and unloading of petroleum and petroleum products, a petroleum storage facility, and two new docks (known hereafter as H1-B and H1-C).
>
> Under the terms of the Lease Agreement, [POCC] will design and construct H1-B & H1-C while [Carlyle] will construct the temporary storage facility, the storage infrastructure, and the pipelines connecting the Lone Star Terminal to its long-term storage facility on the Intracoastal Waterway. [Carlyle] is committing significant guaranteed throughput volumes for up to 50 years (10 years plus four 10-year option periods) which are underwritten in part by their placement of significant capital for the transcontinental pipeline interconnects, the tank storage facility, and the pipeline to the Lone Star marine terminal.
>
> . . . .
>
> **BACKGROUND:**
>
> . . . .
>
> The Lease Agreement is the result of lengthy negotiations between [Carlyle] and [POCC] and represents a mutually beneficial opportunity to serve the growing market demands. [Carlyle] Leadership have indicated their approval of the attached Lease Agreement Terms and Conditions and will recommend to its Board of Directors the approval of the Lease Agreement.

---

[3] TPCC filed a motion to compel production of the Lease, which the trial court denied.

**FINANCIAL IMPACT**: The Lease payments, and throughput fees associated with the long-term minimum volume commitments and the escalation factors over the entire 50-year tenure at today's [POCC] tariff fees represent[] over $2 billion (Minimum Guaranteed Throughput volumes) to $4 billion (base case assumptions) in acretive [sic] revenues for [POCC].

In a March 28, 2019 news release, POCC announced that it approved "a long-term (50-year) lease agreement with [Carlyle] for approximately 200 acres on Harbor Island to develop a state-of-the-art petroleum export terminal." POCC's April 16, 2019 open meeting notice indicated that the POCC commissioners would consider ratifying the Lease:

> **11.     Consent Agenda** . . .
>
> 11.a.  Ratify Lease Agreement for up to 50 years with [Carlyle] for land on Harbor Island related to marine terminal and associated facilities.

Britton averred that the execution of the Lease ended POCC's "obligations under the MOU, and [POCC] is no longer operating under the MOU." Britton further stated that "[n]either the MOU nor [the Lease] require [POCC] to make fixed payments to [Carlyle] in exchange for [Carlyle] making their physical assets or services available to [POCC]." Rather, according to Britton, POCC "will receive lease payments and other fees from [Carlyle] under [the Lease]."

**E.     Trial Court's Ruling**

Following a non-evidentiary hearing, the trial court signed an order granting POCC's plea to the jurisdiction and dismissing TPCC's counterclaims. TPCC then appealed.[4]  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8).

_____

[4] We previously issued an opinion denying TPCC's request for mandamus relief in relation to the

11

**F.** **Termination of Lease and Supplemental Briefing**

On March 16, 2021, after the parties filed their briefs and presented oral argument to the Court, POCC terminated the Lease. We took judicial notice of this fact and abated the case so that the parties could file supplemental briefs concerning whether this development rendered any of TPCC's claims moot. The parties have filed their supplemental briefs, and we have since reinstated the appeal.

## II.    MOOTNESS

**A.** **Standard of Review & Applicable Law**

Appellate courts have a duty to assess their own jurisdiction sua sponte, and we may ascertain facts necessary to the exercise of our jurisdiction. *Ward v. Lamar Univ.*, 484 S.W.3d 440, 450–51 (Tex. App.—Houston [14th Dist.] 2016, no pet.); *see* TEX. GOV'T CODE ANN. § 22.220(c) ("Each court of appeals may, on affidavit or otherwise, as the court may determine, ascertain the matters of fact that are necessary to the proper exercise of its jurisdiction."). The Court may take judicial notice of adjudicative facts that are matters of public record on its own motion and for the first time on appeal, as we have done in this case. TEX. R. EVID. 201(b), (c), (f); *Office of Pub. Util. Couns. v. Pub. Util. Comm'n of Tex.*, 878 S.W.2d 598, 600 (Tex. 1994); *see In re Estate of Hemsley*, 460 S.W.3d 629, 638–39 (Tex. App.—El Paso 2014, pet. denied) (taking judicial notice that it was widely reported on local, state, and national news that Hemsley was buried in El Paso on November 21, 2012 at Fort Bliss National Cemetery); *Hudson v. Markum*, 931 S.W.2d 336, 337 n.1 (Tex. App.—Dallas 1996, no writ) (taking judicial notice of a funeral and

---

trial court's denial of a temporary restraining order in the underlying cause. *In re Port of Corpus Christi, L.P.*, 579 S.W.3d 129, 130 (Tex. App.—Corpus Christi–Edinburg 2019, orig. proceeding).

death announcement in the Dallas Morning News); *see also Ex parte Barrett*, 608 S.W.3d 80, 86 (Tex. App.—Dallas 2020, pet. filed). Having judicially noticed that POCC has terminated the Lease, we must determine whether this development moots any of the issues raised on appeal.

We review the question of mootness de novo. *Matthews v. Kountze Indep. Sch. Dist.*, 484 S.W.3d 416, 418 (Tex. 2016). A case becomes moot when there ceases to be a justiciable controversy between the parties or when the parties cease to have "a legally cognizable interest in the outcome." *State ex rel. Best v. Harper*, 562 S.W.3d 1, 6 (Tex. 2018). A case can become moot at any time, including on appeal. *Id*. When a case becomes moot, the court loses jurisdiction and cannot hear the case because any decision would constitute an advisory opinion that is "outside the jurisdiction conferred by Texas Constitution article II, section 1." *Matthews*, 484 S.W.3d at 418. But a case "is not rendered moot simply because some of the issues become moot during the appellate process." *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 737 (Tex. 2005) (orig. proceeding). If only some claims or issues become moot, the case remains live as to other claims or issues that are not moot. *See id*.

## B.   Analysis

TPCC's TOMA, PPFIA, Water Code, ultra vires, and unlawful delegation claims each urge that the Lease is void and its performance must be enjoined. Because the Lease has been terminated, there is no live case or controversy which the trial court could remedy by taking action on the merits. Accordingly, we conclude that these claims are

13

now moot.[5] *See City of El Paso v. Waterblasting Techs., Inc.*, 491 S.W.3d 890, 906 (Tex. App.—El Paso 2016, no pet.) (concluding that statutory action seeking to enjoin performance of a fully performed contract and ultra vires claim seeking to declare the contract void were moot); *Meeker v. Tarrant Cnty. Coll. Dist.*, 317 S.W.3d 754, 760 (Tex. App.—Fort Worth 2010, pet. denied) (concluding that suit seeking injunctive relief relating to college's employment of a chancellor was moot where chancellor was no longer employed by the college); *see also Calhoun Port Auth. v. Victoria Advoc. Publ'g Co.*, No. 13-18-00486-CV, 2019 WL 1562003, at *3–4 (Tex. App.—Corpus Christi–Edinburg Apr. 11, 2019, pet. denied) (mem. op.) (holding that a TOMA claim relating to the hiring of a lobbyist was mooted by his resignation); *Cook v. Hedtke*, No. 03-17-00663-CV, 2018 WL 1660078, at *3 (Tex. App.—Austin Apr. 6, 2018, no pet.) (mem. op.) (declining to address as moot whether a past TOMA violation occurred because it "would have no practical effect on the parties"); *Hutto Citizens Grp. v. County of Williamson*, No. 03-08-00578-CV, 2009 WL 2195582, at *4 (Tex. App.—Austin July 23, 2009, no pet.) (mem. op.) (concluding that suit seeking to void a contract was moot after a superseding contract was executed); *City of Galveston v. Saint-Paul*, No. 01-06-00580-CV, 2008 WL 384145, at *4 (Tex. App.—Houston [1st Dist.] Feb. 14, 2008, pet. denied) (mem. op) (concluding

---

[5] We note that TOMA also permits an action by mandamus or injunction to "prevent" a "violation or threatened violation." *See* TEX. GOV'T CODE ANN. § 551.142(a). However, the only actions TPCC alleges were violations of TOMA have already been effectively reversed, and it does not allege any "threatened violation" of the statute. *See id.*; *see also Calhoun Port Auth. v. Victoria Advoc. Publ'g Co.*, No. 13-18-00486-CV, 2019 WL 1562003, at *3–4 (Tex. App.—Corpus Christi–Edinburg Apr. 11, 2019, pet. denied) (mem. op.).

We further note that the undisputed evidence establishes that the Lease superseded the MOU and that the MOU is no longer in effect. Therefore, TPCC's alleged statutory violations pertaining to the MOU are moot as well.

14

that the governing body's approval of a superseding agreement rendered moot any claim that TOMA was violated concerning notice for the prior agreement). Further, TPCC's related declaratory judgment claims are moot for the same reasons.[6] *See Speer v. Presbyterian Child.'s Home & Serv. Agency*, 847 S.W.2d 227, 229 (Tex. 1993) ("[W]hen the action sought to be enjoined is accomplished and 'suitable coercive relief' becomes impossible, it is improper to grant declaratory relief." (quoting *McKie v. Bullock*, 491 S.W.2d 659, 660 (Tex. 1973)); *Waterblasting Techs.*, 491 S.W.3d at 906 (explaining that when a request for injunctive relief becomes moot, an accompanying request for declaratory relief also becomes moot).

## C.  Exceptions to Mootness

TPCC argues, in the event we conclude that its claims are moot, that two exceptions to the mootness doctrine apply to its claims.

### 1.  Voluntary-Cessation Exception

First, TPCC argues that POCC's voluntary cessation of the challenged conduct does not moot TPCC's claims because it is not absolutely clear that POCC will refrain from such conduct in the future. It is true that a defendant's cessation of certain conduct does not, in itself, deprive a court of jurisdiction on the basis of mootness, because if it

---

[6] TPCC's claim for attorney's fees does not breathe life into these mooted claims. Where a claimant seeks fees under a statute that authorizes fees only for a prevailing party, its claim for attorney's fees becomes moot if the party does not prevail before the substantive claim becomes moot. *State ex rel. Best v. Harper*, 562 S.W.3d 1, 7–8 (Tex. 2018). Of the mooted claims, TPCC seeks attorney's fees only for its TOMA claim. However, TOMA permits an award of attorney's fees only to a prevailing party. *See* TEX. GOV'T CODE ANN. § 551.142 (b). Because TPCC cannot prevail on this claim, its request for attorney's fees is moot as well. *See Harper*, 562 S.W.3d at 7–8. Further, TPCC's live pleading does not pray for attorney's fees under the Declaratory Judgment Act which permits the trial court to "award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. "The party requesting attorney's fees must affirmatively plead for them to be eligible for a judgment containing a fee award." *Wells Fargo Bank, N.A. v. Murphy*, 458 S.W.3d 912, 915 (Tex. 2015) (citing TEX. R. CIV. P. 301).

15

did, "defendants could control the jurisdiction of courts with protestations of repentance and reform, while remaining free to return to their old ways." *Matthews*, 484 S.W.3d at 418. However, dismissal may be appropriate when subsequent events make it clear that the challenged conduct could not reasonably be expected to recur. *Id*.

In urging that we apply this mootness exception, TPCC relies solely on the possibility that POCC might enter into a future agreement to develop a crude oil export terminal on Harbor Island. While it is entirely possible that POCC may pursue such an agreement, its authority to do so is not in question. Rather, TPCC's claims strictly complain of the manner in which the prior agreement was reached. In that regard, TPCC does not request any relief seeking to prevent future statutory violations, aside from seeking to enjoin the now-terminated Lease. Further, the fear that POCC may violate statutory requirements in the future is too speculative to support the application of a mootness exception. *See Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001) (concluding that speculation of future unlawful conduct could not support application of a mootness exception). Accordingly, we conclude that this case does not involve a voluntary cessation of challenged conduct that may recur absent the requested injunctive relief. *See Matthews*, 484 S.W.3d at 418.

## 2. Public-Interest Exception

Next, TPCC maintains that the public-interest exception to mootness applies. "The public-interest exception allows appellate review of an issue of considerable public importance if that issue is capable of repetition between either the same parties or other

16

members of the public, but for some reason evades appellate review."[7] *Ngo v. Ngo*, 133 S.W.3d 688, 692 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.) (citing *Tex. Dep't of Pub. Safety v. LaFleur*, 32 S.W.3d 911, 914 (Tex. App.—Texarkana 2000, no pet.)). For purposes of this exception, an issue does not evade review if Texas appellate courts have previously considered the issue. *Id*. (citing *FDIC v. Nueces County*, 886 S.W.2d 766, 767 (Tex. 1994)).

TPCC's mooted claims concern public disclosure and competitive bidding requirements of various statutes, issues which are commonly considered by appellate courts. *See, e.g., Chambers-Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 350 (Tex. 2019) (discussing authority of navigation districts created by Article XVI, § 59 of the Texas Constitution to lease land); *Meeker*, 317 S.W.3d at 762 (collecting cases that have addressed TOMA compliance); *Richmond Printing v. Port of Hous. Auth*., 996 S.W.2d 220, 223 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (discussing competitive bidding requirements applicable to navigation districts that have adopted the provisions of the Texas Water Code). Therefore, we conclude that these issues have not "evaded review" as required for the public-interest exception to apply. *See Meeker*, 317 S.W.3d at 761–62 (concluding that the public-interest exception did not apply to TOMA claim); *see also Hutto Citizens Grp*., 2009 WL 2195582, at *3 (concluding that the public-interest exception did not apply to claimed violation of statutory competitive bidding requirements).

---

[7] TPCC does not urge the application of the related "capable of repetition, yet evading review" exception which requires that a plaintiff prove that: (1) the challenged action was too short in duration to be litigated; and (2) a reasonable expectation exists that the same complaining party will be subject to the same action again. *Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001).

Having concluded that the exceptions to the mootness doctrine do not apply, we will proceed to address TPCC's issues as they concern its non-mooted claims.

### III. PLEA TO THE JURISDICTION

In its first issue, TPCC argues the trial court erred in granting POCC's plea to the jurisdiction. TPCC's issue includes multiple sub-issues which we address below.

## A. Standard of Review & Applicable Law

A plea to the jurisdiction is a dilatory plea; its purpose is "to defeat a cause of action without regard to whether the claims asserted have merit." *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). The plea challenges the trial court's subject matter jurisdiction over a pleaded cause of action. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Subject matter jurisdiction is a question of law; therefore, when the determinative facts are undisputed, we review the trial court's ruling on a plea to the jurisdiction de novo. *Id*.

When a plea to the jurisdiction challenges the pleadings, we determine if the plaintiff has met its burden to allege facts affirmatively demonstrating the court's jurisdiction to hear the cause. *Miranda*, 133 S.W.3d at 226 (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). We construe the pleadings liberally in favor of the plaintiffs and look to the pleader's intent. *Id*. If the pleadings do not contain sufficient facts to affirmatively demonstrate jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff should be afforded the opportunity to amend. *Id*. at 226–27. If the pleadings affirmatively negate jurisdiction, then the plea may be granted without affording the

18

plaintiff this opportunity. *Id*. at 227.

"When a defendant challenges jurisdiction, a court 'is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised.'" *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019) (quoting *Bland Indep. Sch. Dist.*, 34 S.W.3d at 555). This is true even when the jurisdictional issue intertwines with the merits of the case. *Id*. When a plea to the jurisdiction challenges the existence of jurisdictional facts, the standard of review mirrors that of a summary judgment, meaning that all the evidence is reviewed in the light most favorable to the plaintiff to determine whether a genuine issue of material fact exists. *Id*. In the face of an evidentiary challenge, the plaintiff has the burden to present sufficient evidence to create a genuine issue of material fact regarding the jurisdictional issue. *Id*. at 552. If the evidence raises a fact issue regarding jurisdiction, the plea cannot be granted, and a fact finder must resolve the issue. *Miranda*, 133 S.W.3d. at 227–28. On the other hand, if the evidence is undisputed or fails to raise a fact issue, the plea must be determined as a matter of law. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012*)*; *Miranda*, 133 S.W.3d at 228.

Governmental immunity[8] deprives a trial court of jurisdiction over lawsuits in which the State's political subdivisions have been sued unless the State consents to suit by waiving immunity. *Miranda*, 133 S.W.3d at 226. Therefore, governmental immunity is properly asserted in a plea to the jurisdiction. *Id*. at 225–26. "[T]he manner in which the government conveys its consent to suit is through the Constitution and state laws."

---

[8] As a political subdivision, POCC is generally protected from suit by governmental immunity. *See Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 57–58 (Tex. 2011).

*Garcia*, 253 S.W.3d at 660. Thus, "'it is the Legislature's sole province to waive or abrogate sovereign immunity.'" *Id*. (quoting *Texas Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002)). A statutory waiver must be clear and unambiguous and must be read narrowly. *LMV-AL Ventures, LLC v. Tex. Dep't of Aging & Disability Servs.*, 520 S.W.3d 113, 120 (Tex. App.—Austin 2017, pet. denied); *see* TEX. GOV'T CODE ANN. § 311.034 ("[A] statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language[.]").

## B. *Reata* Rule

We first address TPCC's argument that its counterclaims fall within the *Reata* scope-of-immunity rule because they are defensive to, and offset, POCC's claims. *See Reata*, 197 S.W.3d at 371. TPCC limits its *Reata* argument to those counterclaims concerning POCC's Harbor Island Project:

> TPCC's claims that POCC is illegally conducting its business in violation of statutes, on land it promised to offer TPCC, using TPCC's own purloined plans, and that these acts are void, are all germane to, connected with, and properly defensive of, POCC's claim. POCC opened the door.

These counterclaims include TPCC's ultra vires, Water Code, PPFIA, TOMA, breach of contract, and unlawful delegation causes of action. TPCC offers no argument concerning the application of the *Reata* exception to its remaining counterclaims. Because we have already concluded that all but one of these claims are now moot, we will only address *Reata's* application to the breach of contract claim.

### 1. Applicable Law

In *Reata*, a contractor sued a subcontractor, alleging that the subcontractor negligently drilled into a water main. *Id*. at 373. The subcontractor filed a third-party claim

20

against the City of Dallas. *See id*. Before answering the subcontractor's third-party claim, the City intervened and "assert[ed] claims of negligence against [the subcontractor] and a plea to the jurisdiction asserting governmental immunity from suit." *Id*. The Texas Supreme Court noted that the City was seeking to recover for the subcontractor's negligence, while maintaining that it was immune from answering for its own negligence. *See id*. The Court held under those circumstances that "the City does not have immunity from suit as to [the subcontractor's] claims which are germane to, connected with, and properly defensive to the City's claims, to the extent [the subcontractor's] claims offset those asserted by the City." *Id*.

The Court reasoned that "if the governmental entity injects itself into or chooses to engage in litigation to assert affirmative claims for monetary damages, the entity will presumably have made a decision to expend resources to pay litigation costs." *Id*. at 375. In such an instance, the governmental entity has decided to "leave its sphere of immunity from suit for claims against it which are germane to, connected with and properly defensive to" the government's claims. *Id*. at 376. This is not because the governmental entity "waives" its immunity by filing a claim for affirmative relief. *Id*. Rather, the scope of governmental immunity simply does not reach the defensive counterclaims to the extent that any recovery on the counterclaims serves as an "offset" against the government's recovery on its affirmative claims. *Id*. at 377.

The term "germane" has been defined as "closely akin," "being at once relevant and appropriate," "closely or significantly related," "relevant," and "pertinent." *Sweeny Comm. Hosp. v. Mendez*, 226 S.W.3d 584, 592 (Tex. App.—Houston [1st Dist.] 2007, no

21

pet.) (citing MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 525 (11th ed. 2003)); *see City of Dallas v. Albert*, 354 S.W.3d 368, 375 (Tex. 2011) (defining "germane to" as "relevant to"); *see also Tex. Dep't of Transp. v. Crockett*, 257 S.W.3d 412, 415 (Tex. App.—Corpus Christi–Edinburg 2008, pet. denied). Additionally, the term "connected" means "united, joined or linked" and "joined together in sequence; linked coherently" and "having parts or elements logically linked together." *Mendez*, 226 S.W.3d at 592. (citing MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 525 (11th ed. 2003); RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 800 (2d ed. 2001)).

### 2. Analysis

As detailed above, POCC's claims against TPCC are limited solely to TPCC's alleged use of POCC's service marks. To succeed on a common law claim for service mark infringement, a party must show: (1) the name it seeks to protect is eligible for protection; (2) it is the senior user of the name; (3) there is a likelihood of confusion between its mark and that of its competitor; and (4) the likelihood of confusion will cause irreparable injury for which there is no adequate legal remedy. *Restrepo v. All. Riggers & Constructors, Ltd.*, 538 S.W.3d 724, 743–44 (Tex. App.—El Paso 2017, no pet.). To maintain a dilution claim, the plaintiff must establish (1) ownership of a distinctive mark, and (2) a likelihood of dilution. *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Imp. Corp.*, 53 S.W.3d 799, 811 (Tex. App.—Austin 2001, pet. denied).

TPCC's breach of contract claim concerns the development of a crude oil export terminal, and it is not logically linked or relevant to whether TPCC has infringed on POCC's service marks. Rather, this claim arises from "distinct conduct at different times

22

and under very different circumstances." *Crockett*, 257 S.W.3d at 416. Accordingly, we conclude that this counterclaim does not implicate the *Reata* scope-of-immunity rule. *See State v. Langley*, 232 S.W.3d 363, 367 (Tex. App.—Tyler 2007, no pet.) (concluding that breach of contract claim was not germane to, connected with, and properly defensive to the State's eminent domain claims).

## C. Individual Claims

Next, TPCC generally argues that it has properly pleaded and presented evidence to support a waiver of immunity for its claims. We will address each claim in turn to determine whether TPCC has met its burden to establish the trial court's subject matter jurisdiction.[9] *See Swanson*, 590 S.W.3d at 550.

### 1. Takings Claim

POCC's plea to the jurisdiction challenged whether TPCC pleaded a valid takings claim as necessary to invoke a waiver of immunity. *See Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476, 491–92 (Tex. 2012). TPCC's appellate argument concerning the sufficiency of its pleadings for this claim is conclusory and unsupported by argument and pertinent authority. Rule 38.1 of the Texas Rules of Appellate Procedure requires that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Tex. R. App. P. 38.1(i). "Bare assertions of error without argument or authority waive error." *In re J.A.M.R.*, 303 S.W.3d 422, 425 (Tex. App.—Dallas 2010, no pet.). An appellate court is

---

[9] TPCC presents no argument concerning the dismissal of its Public Information Act claim. Further, TPCC's argument concerning its claims for declaratory relief are limited solely to its *ultra vires* and TOMA claims which we have determined are moot. TPCC's argument concerning its breach of contract claim is limited solely to the application of the *Reata* exception.

not permitted to perform an independent review of the record and applicable law to determine whether there was error. *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.). In doing so, we would be abandoning our role as neutral adjudicators and become an advocate for that party. *Id*. We therefore conclude that TPCC's sub-issue concerning the dismissal of its takings claim is waived. *See Eaves v. Unifund CCR Partners*, 301 S.W.3d 402, 409 (Tex. App.—El Paso 2009, no pet.) (holding that the appellant inadequately briefed issue on appeal when its argument consisted of only three conclusory sentences); *Canton–Carter v. Baylor Coll. of Med.*, 271 S.W.3d 928, 931 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (stating that the appellate briefing requirements are not satisfied by merely uttering brief, conclusory statements unsupported by legal citations or substantive analysis).

### 2. Business Disparagement

POCC argued in its plea to the jurisdiction that the Legislature has not waived its governmental immunity for a business disparagement claim. The Texas Tort Claims Act (TTCA) waives governmental immunity for certain negligent conduct, but not for intentional torts. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.021, 101.022, 101.025, 101.057(2); *City of Watauga v. Gordon*, 434 S.W.3d 586, 594 (Tex. 2014). Business disparagement is an intentional tort, which does not fall within TTCA's waiver of immunity. *Richardson Hosp. Auth. v. Duru*, 387 S.W.3d 109, 112 (Tex. App.—Dallas 2012, no pet.); *see also Tamez v. Willacy County*, No. 13-19-00389-CV, 2020 WL 2610931, at *2–3 (Tex. App.—Corpus Christi–Edinburg May 21, 2020, no pet.) (mem. op.). Absent a statutory waiver of immunity, the trial court lacks jurisdiction over this claim. *See Garcia*, 253

24

S.W.3d at 660; *see also* TEX. GOV'T CODE ANN. § 311.034.

### 3. § 1983 Claims

For TPCC's § 1983 claims, POCC acknowledges a waiver of its immunity, but it challenges whether TPCC pleaded a valid claim as necessary to invoke such a waiver. *See* 42 U.S.C.A. § 1983; *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 6 (Tex. 2011). To assert a § 1983 claim, a plaintiff must allege two essential elements: (1) the conduct complained of was committed by a person acting under color of state law, and (2) the conduct deprived a person of a federally protected right. *City of Dallas v. Saucedo-Falls*, 268 S.W.3d 653, 658–59 (Tex. App.—Dallas 2008, pet. denied). A plaintiff's pleading must "do more than merely name a cause of action and assert the existence of a constitutional violation." *Garcia v. Kubosh*, 377 S.W.3d 89, 96 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

### a. Equal Protection

The United States Constitution provides that no state shall deny any person within its jurisdiction the equal protection of the laws. U.S. CONST. amend. XIV, § 1. A plaintiff asserting an equal protection violation when no protected class is implicated must show (1) it was treated differently from other similarly situated persons, and (2) no reasonable basis exists for the disparate treatment. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 335 (Tex. 2017); *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 939 (Tex. 1998).

TPCC's live pleading provides in relevant part as follows:

25

TPCC's rights have been violated by [POCC's] consistent and persistent refusal to grant TPCC easements through property owned by [POCC], which TPCC has repeatedly requested, while at the same time [POCC] was routinely granting easements to other property owners. And the persons to whom [POCC] routinely grants such easements, are situationally directly comparable in all material respects to TPCC, and there is no rational basis for the differential treatment. [POCC] has acted intentionally with the purpose of denying TPCC the ability to develop Berry Island as a liquid cargo terminal. . . . [T]he selective prosecution of TPCC for its name is a selective persecution of TPCC when others similarly situated are freely using similar names, without [POCC] taking any action.

TPCC has failed to allege any facts showing that it was similarly situated to those entities which were granted pipeline easements or which POCC declined to prosecute. *See City of Paris v. Abbott*, 360 S.W.3d 567, 583 (Tex. App.—Texarkana 2011, pet. denied) (concluding that plaintiff failed to allege equal protection violation based on the city's refusal to allow him to develop his property in a certain manner when he failed to allege facts demonstrating that he was similarly situated with others and was treated differently); *City of Dallas v. Jones*, 331 S.W.3d 781, 787 (Tex. App.—Dallas 2010, pet. dism'd) ("It is critical . . . that the plaintiff allege he is being treated differently from those whose situation is directly comparable in all material respects."). Specifically, TPCC has failed to allege that POCC has acted any differently with respect to other entities who intend to develop a competing crude oil export terminal. *See City of Floresville v. Starnes Inv. Group, LLC*, 502 S.W.3d 859, 868 (Tex. App.—San Antonio 2016, no pet.) ("Other than a conclusory statement that it was treated differently from others similarly-situated, Starnes failed to allege, in its amended petition, any facts describing the parties similarly situated or the nature of the different treatment."); *Jones*, 331 S.W.3d at 787 (explaining that plaintiff's complaint that he was treated differently than all other owners of a residential subdivision

did not properly identify similarly situated homeowners where the significant characteristic of the plaintiff's lot was the location of underground sewer pipes in the center of the property). Further, TPCC has failed to allege facts demonstrating that any such differential treatment was without a reasonable basis. *See Fike v. Miller*, 437 S.W.3d 640, 648 (Tex. App.—Tyler 2014, no pet.).

We conclude that TPCC's pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction over the equal protection claim. *See Miranda*, 133 S.W.3d. at 226–27. However, TPCC's pleadings do not affirmatively demonstrate incurable defects in jurisdiction. *See id*. Therefore, the trial court erred in dismissing TPCC's equal protection claim without affording TPCC an opportunity to amend its pleadings. *See id.*

### b. Due Process

TPCC also brings a § 1983 claim premised on a due process violation. TPCC generally alleges that it was denied procedural due process concerning POCC's denial of its request for pipeline easements across POCC's property. POCC argues:

> POCC refuses to grant TPCC's repeated requests for [pipeline] easements or to conduct hearings thereon, denying TPCC the opportunity to (i) be heard, (ii) present its position and/or (iii) face/confront accusers or accusations blocking the grant of easements. POCC refuses to give any notice to TPCC of what it will or may do, leaving TPCC in a proverbial holding pattern, without explanation.
>
> . . . .
>
> A fundamental requirement of due process involves a right to petition the government and be heard in a proceeding and to be accorded appropriate notice reasonably calculated under all the circumstances to afford an opportunity to present positions on matters before the government and address objections. *Armstrong v. Manzo*, 380 U.S. 545, 550, 85 S.Ct. 1187,

14 L.Ed.2d 62 (1965). Failing to provide notice to interested parties of a time and date of hearing constitutes a violation of due process. *See, e.g., Garza v. Maverick Market, Inc.*, 768 S.W.2d 273, 280 (Tex. 1989). Outright denial of hearings resulting in de facto denials, is encompassed within these requirements.

In analyzing a claim of deprivation of procedural due process, we apply a two-part test to determine (1) whether the plaintiff has a liberty or property interest entitled to procedural due process; and (2) if so, what process is due. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982); *Univ. of Tex. Med. Sch. v. Than*, 901 S.W.2d 926, 929 (Tex. 1995); *Dallas County v. Gonzales*, 183 S.W.3d 94, 111 (Tex. App.—Dallas 2006, pet. denied). The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972); *Byers v. Patterson*, 219 S.W.3d 514, 526 (Tex. App.—Tyler 2007, no pet.).

Property rights are created and defined by state law. *Bailey v. Smith*, 581 S.W.3d 374, 389 (Tex. App.—Austin 2019, pet. denied); *Reese v. City of Hunter's Creek Vill.*, 95 S.W.3d 389, 391 (Tex. App.—Houston [1st Dist.] 2002, no pet.). Only vested rights are constitutionally protected. *Bailey*, 581 S.W.3d at 389. To have a constitutionally protected property interest, a person must have a "legitimate claim of entitlement" rather than a mere "unilateral expectation." *Roth*, 408 U.S. at 577; *see Patterson*, 219 S.W.3d at 526. If a plaintiff fails to allege a protected interest, the plaintiff has failed to state a due process claim. *See Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556, 560–61 (Tex. 1985); *City of Arlington v. Centerfolds, Inc.*, 232 S.W.3d 238, 248–49 (Tex. App.—Fort Worth 2007, pet. denied).

Here, TPCC's claimed interest in obtaining pipeline easements over POCC's property is not a vested property right but merely an expectation of a potential interest. *See Roth*, 408 U.S. at 569; *Patterson*, 219 S.W.3d at 526; *see also KEM Tex., Ltd. v. Tex. Dep't of Transp.*, No. 03-08-00468-CV, 2009 WL 1811102, at *6 (Tex. App.—Austin June 26, 2009, no pet.) (mem. op.). We conclude that TPCC's expectation that POCC would grant it a pipeline easement does not qualify as a constitutionally protected property right. *See Roth*, 408 U.S. at 577; *Patterson*, 219 S.W.3d at 526. As a result, TPCC has failed to allege a procedural due process claim, and the trial court did not err in determining that it lacked jurisdiction over this claim. *See Andrade*, 345 S.W.3d at 6.

**D.      Summary**

We sustain that portion of TPCC's first issue challenging the dismissal of its equal protection claim. We overrule the remainder of TPCC's first issue. We further conclude that the pleading deficiencies we have highlighted, except for the equal protection claim, constitute incurable defects; therefore, TPCC is not entitled to amend its pleadings on remand.[10] *See Miranda*, 133 S.W.3d at 226–27.

**IV.      CONCLUSION**

We vacate that portion of the trial court's judgment dismissing TPCC's TOMA, PPFIA, Water Code, *ultra vires*, and unlawful delegation claims. *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 586 (Tex. 2017) (vacating only that portion of the judgment relating to moot claims). We reverse that portion of the trial court's judgment dismissing

---

[10] Based on our resolution of this issue, we need not address TPCC's second issue, which is premised on the trial court's denial of its motion to compel production of the Lease. *See* TEX. R. APP. P. 47.1. Our analysis of TPCC's claims is not dependent on the terms of the Lease.

TPCC's equal protection claim, and we remand the case to the trial court for further proceedings consistent with this opinion. We affirm the remainder of the trial court's judgment.

LETICIA HINOJOSA
Justice

Delivered and filed on the
1st day of July, 2021.