COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  |  |  |
|---|---|---|
| | § | |
| | § | No. 08-12-00368-CV |
| IN THE MATTER OF THE ESTATE OF | § | Appeal from |
| SHERMAN ALEXANDER HEMSLEY, | § | Probate Court No. 1 |
| DECEASED. | § | of El Paso County, Texas |
| | § | (TC # 2012-CPR05109) |
| | § | |

## **O P I N I O N**

Richard Thornton and Robert Thornton appeal an order of the probate court admitting the will of Sherman Alexander Hemsley to probate, authorizing issuance of letters testamentary to Flora Isela Enchinton Bernal, and determining that Bernal is the person entitled to make the disposition of Hemsley's remains.

### **PROCEDURAL AND FACTUAL BACKGROUND**

Sherman Alexander Hemsley was a popular actor who is best known for his role as George Jefferson on the ground-breaking television shows "All in the Family" and "The Jeffersons" which ran from 1975 to 1985. Hemsley never married and had no children. He continued to work as an actor and entertainer until at least 2011. Bernal was Hemsley's business manager for the last twenty years and she described their relationship as that of business partners,

best friends, and family. Hemsley and Bernal lived together in El Paso for the last sixteen years of his life. Hemsley considered El Paso to be his home and Bernal to be his family. After being diagnosed with an incurable lung cancer, Hemsley executed a will on June 13, 2012 naming Bernal as the independent executrix and sole beneficiary of his estate. He died in El Paso on July 24, 2012 at the age of seventy-four.

Hemsley was born in 1938 in Philadelphia, Pennsylvania to Arsena Hemsley Chisholm. He was raised by his mother, aunt, and grandmother in a poor neighborhood. They later moved to New York. Hemsley told Bernal and stated during interviews given at various times during his life that he did not have a relationship with his father. Robert Thornton[1] testified during the probate proceedings that his grandfather, William Alexander Thornton, was a Methodist minister and married when he had an affair with Chisholm. Richard Thornton is the son of William Alexander Thornton. Richard testified that both his older brother and his father had told him that Hemsley was his brother. According to Richard, Hemsley took his mother's maiden name because it would have been "bad news" for Richard's father if Hemsley had taken Thornton as his last name. The probate court granted Richard's motion for genetic testing and the DNA test results established that he is Hemsley's half-brother. While Robert testified that he spoke with Hemsley frequently by telephone or email, Richard did not maintain contact with Hemsley either by phone or mail over the years. Bernal first met Robert and Richard in April 2011 when they attended a performance by Hemsley at a comedy club in Cherry Hill, New Jersey. Richard recalled that Hemsley introduced him to the audience as his brother, but Bernal maintained that Hemsley never told her that he had a brother and she was unaware until after Hemsley's death that Richard was his brother. Bernal knew some of Hemsley's relatives on his mother's side of

---

[1] For convenience, the opinion will refer to the appellants collectively as the Thorntons or when necessary to identify them individually by each man's first name.

the family but she recalled that Hemsley never discussed his father or any relatives on that side of the family. Hemsley told at least one friend that he did not have any family in Philadelphia.

Shortly after Hemsley's death, a dispute arose between the Thorntons and Bernal with respect to the disposition of Hemsley's remains. Bernal intended to bury Hemsley during a military funeral at Fort Bliss in accordance with his wishes. The medical examiner's office refused to release the remains to Bernal, however, and the medical examiner utilized Hemsley's cell phone in an effort to locate his next of kin. Someone from the medical examiner's office called Richard who told the caller he was Hemsley's brother. Based on that representation, the medical examiner's office released Hemsley's body to the Thorntons. The Thornton family made arrangements to have Hemsley's body taken to a funeral home in El Paso to have the remains prepared for transportation to Pennsylvania for burial at the Washington National Crossing Cemetery.

Bernal filed an application to probate the will and for issuance of letters testamentary one week after Hemsley's death. Richard contested Bernal's application on the ground that the signature on the will had not been made by Hemsley, or alternatively, Hemsley was not of sound mind when he made the will. The contest also included Richard's petition for a declaratory judgment in which he asked the probate court to declare that he has the right to determine the disposition of Hemsley's remains. In her answer, Bernal requested that the probate court release the remains to her.

Following a bench trial, the probate court entered an order resolving all of the issues. With respect to Richard's contest, the court found by a preponderance of the evidence that Hemsley had testamentary capacity to execute the will, he was not subject to any undue influence at the time the will was executed, and the signature on the will was that of Hemsley.

Regarding Richard's petition for declaratory judgment, the probate court found that Bernal was the person entitled to dispose of Hemsley's remains under Section 711.002 of Texas Health and Safety Code. Significant to this issue, the probate court expressly determined that the DNA evidence presented by Richard was admissible only for the limited purpose of establishing a right to inherit pursuant to Sections 53B and 53C of the Texas Probate Code. The probate court admitted the will to probate, ordered that Bernal be appointed independent executor of Hemsley's estate, and ordered that letters testamentary issue. Finally, the court ordered that Bernal was the person entitled to make decisions about the disposition of Hemsley's remains pursuant to Section 711.002 of the Texas Health and Safety Code.

## TESTAMENTARY CAPACITY

In Issues One and Two, the Thorntons challenge the legal and factual sufficiency of the evidence supporting the trial court's determination that Hemsley had testamentary capacity to execute the will. To have the right and power to make a last will and testament, a testator must be of sound mind. TEX.ESTATES CODE ANN. § 251.001 (West 2014).[2] This means that the testator must have testamentary capacity at the time the will is executed. *In re Neville*, 67 S.W.3d 522, 524 (Tex.App.--Texarkana 2002, no pet.). When a contest is filed before the will is admitted to probate, the proponent of the will bears the burden of establishing that it was properly executed and that the testator had testamentary capacity. *Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983); *In the Estate of Coleman*, 360 S.W.3d 606, 610 (Tex.App.--El Paso 2011, no pet.).

The testamentary capacity requirement is satisfied upon proof the testator had sufficient

---

[2] The prior version of the statute is Section 57 of the Texas Probate Code. Effective January 1, 2014, the Legislature made a non-substantive revision of the Texas Probate Code and recodified it as the Texas Estates Code. *See* Acts 2009, 81st Leg., R.S., ch. 680, § 1 et seq., 2009 TEX.GEN.LAWS 1512, Acts 2011, 82nd Leg., R.S., ch. 823, § 1 et seq., 2011 Tex.Gen.Laws 1901. We cite to the current version for convenience.

mental ability to understand he is making a will, the effect of making a will, and the general nature and extent of his property. *Long v. Long*, 196 S.W.3d 460, 464 (Tex.App.--Dallas 2006, no pet.); *In re Neville*, 67 S.W.3d at 524. He must also know his next of kin and the natural objects of his bounty, the claims upon them, and have sufficient memory to collect in his mind the elements of the business transacted and hold them long enough to form a reasonable judgment about them. *In re Estate of Blakes*, 104 S.W.3d 333, 336 (Tex.App.--Dallas 2003, no pet.). In determining whether a testator had testamentary capacity, the pivotal issue is whether the testator had testamentary capacity on the day the will was executed. *Long*, 196 S.W.3d at 464-65. Evidence of the testator's state of mind at other times can be used to prove his state of mind on the day the will was executed if the evidence demonstrates that a condition affecting his testamentary capacity was persistent and was likely present at the time the will was executed. *Id.* at 465.

*Legal Sufficiency*

We will consider first the Thorntons' challenge to the legal sufficiency of the evidence supporting the probate court's finding that Hemsley had testamentary capacity when he executed the will. In an appeal from a bench trial, we review legal and factual sufficiency issues under the same standards that are applied to the review of a jury's verdict. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). An appellate court will sustain a legal sufficiency or "no-evidence" challenge if the record shows: (1) the complete absence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Kohannim v. Katoli*, 440 S.W.3d 798, 811 (Tex.App.--El Paso

2013, pet. denied). In conducting our review, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822; *Kohannim*, 440 S.W.3d at 811. We are also mindful that the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id*. at 819. When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. *Id*. at 820. In every circumstance in which a reasonable trier of fact could resolve conflicting evidence either way, the reviewing court must presume it did so in favor of the prevailing party, and disregard the conflicting evidence in its sufficiency review. *Id*. at 821. If the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the trier of fact must be allowed to do so. *Id*. at 822. The ultimate test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to make the finding under review. *Id*. at 827.

For a few years prior to his death, Hemsley had told Bernal on more than one occasion that he wanted to make a will leaving everything to her. When Hemsley was diagnosed with cancer and he decided to refuse chemotherapy and radiation treatment, he asked Bernal to contact an attorney to draft a medical power of attorney and a will. Bernal called Jonathan Huerta on June 8, 2012 and asked him to draft a medical power of attorney. Hemsley was hospitalized at the time and receiving steroids to treat swelling caused by the tumor. Huerta went to the hospital at around 9:30 p.m. to meet with Hemsley. Huerta engaged in conversation with Hemsley and went over the document appointing Bernal as Hemsley's agent under the power of attorney. Hemsley told Huerta that he had known Bernal for over twenty years and she handled all of his affairs. In Huerta's opinion, Hemsley was of sound mind and fully cognizant that he was talking to Huerta about the document and understood it to the point that Hemsley

made amendments to it.  Huerta noted that Hemsley did not appear to be in pain, sedated, or under the influence of any drugs.  During this same conversation, Hemsley also asked Huerta if he would be interested in drafting a will for him.  Before proceeding with the conversation any further, Huerta asked whether Hemsley would like for Bernal to remain in the room while they talked about the will.  Hemsley indicated he wanted Bernal in the room and he told Huerta that he wanted her to be the executor and he was leaving his entire estate to her.  Huerta ultimately declined to draft the will because he anticipated there would be a will contest given that Hemsley was a celebrity and he feared it would overwhelm his firm.

After Huerta declined to draft the will, Bernal called Julian Horwitz, an attorney with fifty years of experience in the area of probate and administration of estates.  Horwitz estimated he had prepared hundreds of wills during his career.  Horwitz had several telephone conversations with Bernal before drafting the will and he went to the hospital with the document on June 13, 2012.  Once the witnesses arrived, Horwitz entered Hemsley's room and observed that him seated in a chair in a semi-reclined position.  Horwitz went over each provision of the will in detail with Hemsley.  He recalled that when he discussed the provisions regarding the appointment of the executor and the disposition of the estate, Hemsley emphasized that he wanted Bernal to "handle everything" and he was adamant that he wanted all of his possessions to pass at his death to Bernal.  Horwitz observed that Hemsley "firmly and lucidly" signed each page of the will and the self-proving affidavit.  In Horwitz's opinion, Hemsley was in full possession of all of his faculties and there was nothing that caused Horwitz to believe Hemsley lacked testamentary capacity.  He specifically stated it was his unequivocal opinion that Hemsley had testamentary capacity when he executed the will.

Fabian Barragan witnessed Hemsley sign the will and the self-proving affidavit.  He is a

friend of Bernal's daughter and he had known Hemsley for over five years at the time the will was executed. When they entered the hospital room, Hemsley stood up from a seated position and shook their hands. Hemsley did not appear to be sedated or in pain. Barragan recalled that the attorney went over the will with Hemsley in a slow and methodical manner. At one point, Hemsley even glanced over at Bernal and jokingly made a face indicating he understood the will and he wanted Horwitz to get on with it. In Barragan's opinion, Hemsley had his normal faculties and understood the will and what he was doing. He recalled that Hemsley expressly stated that he wanted Bernal to have everything.

Roland Sanchez also witnessed Hemsley sign the will and the self-proving affidavit. Sanchez is a friend of Bernal's daughter and he had known Hemsley for approximately fifteen years. He had gone to concerts with Hemsley, had driven him to the store,[3] and had done some computer work for him. Barragan called Sanchez and told him that Bernal wanted him to go to the hospital to witness the will. After entering the hospital room, Sanchez observed that Hemsley was connected to an IV but he was alert and responsive while Horwitz went through the will with him. When Horwitz got to the section of the will regarding appointment of the executor, Hemsley indicated he wanted Bernal to be the executor and pointed to her. Hemsley also indicated he wanted everything to go to Bernal.

Heinz-Ulrich Landeck is a registered nurse who was the designated charge nurse during the time Hemsley was hospitalized. When asked whether he had any concerns about Hemsley's mental capacity, Landeck testified that, from a nursing standpoint, Hemsley was always alert and oriented as to person, time, situation, and place.

The Thorntons first contend that the evidence is legally insufficient because Horwitz did not engage in any conversation with Hemsley and he did not undertake to determine whether

---

[3] Hemsley did not drive or have a driver's license.

Hemsley had testamentary capacity. This argument is contrary to the evidence and the inferences which can be drawn from that evidence. In addition to making clear that he is familiar with the legal definition of testamentary capacity, Horwitz explained that whenever he is called upon to prepare a will for a client who is hospitalized, especially when he has not had occasion to previously meet with the client, he is particularly alert to the circumstances and he ascertains whether the client understands why Horwitz is there and his purpose. In this case, he spoke with Hemsley and concluded that he was in full possession of his faculties and he understood that Horwitz had prepared a will.

The Thorntons also assert that Horwitz rushed through the execution of the will without regard to whether Hemsley had testamentary capacity. This assertion is also contradicted by the evidence. None of the witnesses testified regarding how long it took to execute the will, but at least one witness noted that Horwitz went through the will slowly and methodically and Hemsley indicated he understood the will and its provisions. Furthermore, the critical question is not how long it took to execute the will but whether Hemsley had testamentary capacity at the time he executed it.

Bernal presented the probate court with testimony from multiple witnesses, including people who knew him prior to his cancer diagnosis, that Hemsley had sufficient mental ability at the time he executed the will to understand that he was making a will and the effect of making a will. The Thorntons argue, however, that the evidence is legally insufficient because there is no evidence that Hemsley discussed his relatives or the approximate nature of his property with Horwitz or the witnesses. A finding of testamentary capacity does not hinge entirely on direct evidence that the testator discussed the details of his heirs, wealth, or disposition at the time he signed his will. *In re Estate of Arrington*, 365 S.W.3d 463, 468 (Tex.App.--Houston [1st Dist.]

2012, no pet.). The probate court heard direct evidence of Hemsley's general mental condition on the day he executed his will. Each witness who was present recounted that Hemsley knew he was executing his will and he indicated that he had deliberately chosen Bernal to not only be his executor but also the sole beneficiary. This evidence "would enable reasonable and fair-minded people to reach the verdict under review." *In re Estate of Arrington*, 365 S.W.3d at 468-69, *quoting City of Keller*, 168 S.W.3d at 827. Accordingly, we conclude that the evidence is legally sufficient to support the probate court's finding that Hemsley had testamentary capacity at the time he executed the will. *See In re Estate of Arrington*, 365 S.W.3d at 468 (finding evidence legally sufficient to support finding of testamentary capacity where the testator did not discuss his children or the approximate nature of his property with the witnesses on the date he executed the will, but there was direct evidence of the testator's mental condition on that date and the evidence supported the jury's determination that the testator knew he was executing his will and he had deliberately chosen to leave his estate to the sole beneficiary); *Collins v. Smith*, 53 S.W.3d 832, 843 (Tex.App.--Houston [1st Dist.] 2001, no pet.)(evidence that testator was of sound mind and knew what he was doing when he executed will was sufficient to remove any suspicion surrounding wills execution). We overrule Issue One.

## *Factual Sufficiency*

In their second issue, the Thorntons challenge the factual sufficiency of the evidence on the same grounds presented in Issue One. When the appellant challenges the factual sufficiency of an adverse finding on which the other party had the burden of proof, the appellant must demonstrate that there is insufficient evidence to support the adverse finding. *Rhey v. Redic*, 408 S.W.3d 440, 449 (Tex.App.--El Paso 2013, no pet.); *Escalante v. State Office of Risk Management*, 355 S.W.3d 341, 345 (Tex.App.--El Paso 2011, no pet.). We will consider, weigh,

and examine all of the evidence in the record, both in support of, and contrary to, the finding. *Rhey*, 408 S.W.3d at 449; *Escalante*, 355 S.W.3d at 345. The trial court's findings will be set aside only if they are so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Rhey*, 408 S.W.3d at 449; *see City of Keller*, 168 S.W.3d at 822. When the evidence is conflicting, we must presume that the fact-finder resolved the inconsistency in favor of the challenged finding if a reasonable person could do so. *See City of Keller*, 168 S.W.3d. at 821.

The probate court had evidence before it that Hemsley had contemplated making a will for at least three years prior to becoming ill and he had sufficient mental ability at the time he executed his will in 2012 to understand he was making a will and the effect of making a will. While Hemsley did not openly discuss any relatives or the general nature and extent of his property, he made it abundantly clear that he intended to leave his entire estate to Bernal. We conclude that the evidence is factually sufficient to support the court's finding that Hemsley had testamentary capacity. We overrule Issue Two.

## DISPOSITION OF THE REMAINS

In their final issue, the Thorntons argue that the trial court erred by allowing Bernal to determine the disposition of Hemsley's remains because she is not a relative and Hemsley did not leave written instructions pursuant to Section 711.002(g) of the Health and Safety Code or designate a person to dispose of his remains. *See* TEX.HEALTH&SAFETY CODE ANN. § 711.002(g)(West Supp. 2014). The Thorntons contend that Richard, as Hemsley's half-brother, has the right to control the disposition of the remains pursuant to Section 711.002(a)(5), and alternatively, Robert, as Hemsley's nephew, has the right by virtue of Section 711.002(a)(6). TEX.HEALTH&SAFETY CODE ANN. § 711.002(a)(5), (a)(6). Bernal responds that the issue is

moot because the Thorntons failed to suspend the judgment pending appeal and Hemsley has been buried at Fort Bliss National Cemetery.[4] We agree.

An appellate court is prohibited from deciding a moot controversy. *See National Collegiate Athletic Association v. Jones*, 1 S.W.3d 83, 86 (Tex. 1999). This prohibition is rooted in the separation of powers doctrine in the Texas and United States Constitutions that prohibits courts from rendering advisory opinions. *See National Collegiate*, 1 S.W.3d at 86. The mootness doctrine dictates that courts avoid rendering advisory opinions by only deciding issues that present a "live" controversy at the time of the decision. *City of Farmers Branch v. Ramos*, 235 S.W.3d 462, 469 (Tex.App.--Dallas 2007, no pet.), *citing Camarena v. Tex. Employment Commission*, 754 S.W.2d 149, 151 (Tex. 1988). An issue becomes moot when (1) it appears that one seeks to obtain a judgment on some controversy, which in reality does not exist or (2) when one seeks a judgment on some matter which, when rendered for any reason, cannot have any practical legal effect on a then-existing controversy. *City of Farmers Branch*, 235 S.W.3d at 469. Thus, an issue may be moot if it becomes impossible for the court to grant effectual relief for any reason. *In re H & R Block Financial Advisors, Inc.*, 262 S.W.3d 896 (Tex.App.-- Houston [14th Dist.] 2008, orig. proceeding); *see Williams v. Lara*, 52 S.W.3d 171, 184 (Tex. 2001).

At oral argument, counsel for the Thorntons proclaimed that the issue is not moot because the appellate record does not reflect that Hemsley has been buried. The Thorntons are correct that the record is silent regarding the burial, but an appellate court has the discretion to take judicial notice of adjudicative facts that are matters of public record on its own motion and for the first time on appeal. *See* TEX.R.EVID. 201(b), (c), (f); *see Office of Public Utility Counsel*

---

[4] Bernal includes other arguments in her brief related to the third issue, but our disposition of the issue makes it unnecessary to reach them.

*v. Public Utility Commission of Texas*, 878 S.W.2d 598, 600 (Tex. 1994). Generally, appellate courts take judicial notice of facts outside the record only to determine jurisdiction or to resolve matters ancillary to decisions which are mandated by law. *In re R.A.*, 417 S.W.3d 569, 576 (Tex.App.--El Paso 2013, no pet.); *SEI Business Systems, Inc. v. Bank One Texas, N.A.*, 803 S.W.2d 838, 841 (Tex.App.--Dallas 1991, no writ); *see Freedom Communications, Inc. v. Coronado*, 372 S.W.3d 621, 624 (Tex. 2012)(court determined it was appropriate to take judicial notice of facts in a plea agreement because they were relevant to determination whether trial court had jurisdiction). Appellate courts are reluctant to take judicial notice of matters which go to the merits of a dispute. *In re R.A.*, 417 S.W.3d at 576; *SEI Business Systems*, 803 S.W.2d at 841.

We take judicial of the obituary published in the El Paso Times from November 18, 2012 through November 25, 2012 which stated that the funeral service for Hemsley would be on Wednesday, November 21, 2012, at Cielo Vista Church in El Paso and interment would take place at Fort Bliss National Cemetery following the funeral service. *See Hudson v. Markum*, 931 S.W.2d 336, 337 n.1 (Tex.App.--Dallas 1996, no writ)(appellate court took judicial notice of funeral and death announcement in Dallas Morning News). Further, we take judicial notice that it was widely reported on local, state, and national news that Hemsley was buried in El Paso on November 21, 2012 at Fort Bliss National Cemetery.

The issue before the probate court was which of the parties had the right to control the disposition of Hemsley's remains under Section 711.002. Stated in terms of the foregoing authority, this was the "then existing controversy" between the parties. The Thorntons sought a declaration that they, as the next of kin, had that right under Section 711.002 of the Health and Safety Code. This statute is titled "Disposition of Remains; Duty to Inter" and addresses only

the interment of remains.

By permitting Bernal to proceed with the funeral, the Thorntons not only failed to preserve the status quo, they allowed Bernal to exercise the right to dispose of the remains under Section 711.002. The controversy between the parties now includes the question whether the Thorntons have a right to remove the remains. This issue is governed by is governed by Section 711.004 of the Health and Safety Code. *See* TEX.HEALTH&SAFETY CODE ANN. § 711.004 (West 2010). Under Section 711.004, remains interred in a cemetery may be removed from a plot in the cemetery with the written consent of the cemetery organization operating the cemetery and the written consent of the current plot owner or owners and the following persons, in the priority listed: (1) the decedent's surviving spouse; (2) the decedent's surviving adult children; (3) the decedent's surviving parents; (4) the decedent's adult siblings; or (5) the adult person in the next degree of kinship in the order named by law to inherit the estate of the decedent. *Id.*, § 711.004(a). If the consent required by Section 711.004(a) cannot be obtained, the remains may be removed by permission of a district court of the county in which the cemetery is located. *Id.*, § 711.004(c). The party seeking to remove the remains must file an application in the district court after giving notice to: (1) the cemetery organization operating the cemetery in which the remains are interred or if the cemetery organization cannot be located or does not exist, the Texas Historical Commission; (2) each person whose consent is required for removal of the remains under Section 711.004(a); and (3) any other person that the court requires to be served. *Id.*, § 711.004(c). Whether the remains can be disinterred under Section 711.004 was never presented to or addressed by the probate court and it is not a matter which we can consider or resolve in this appeal.

No Texas appellate court has addressed the precise mootness issue before us but

Bernal cites persuasive authority from Florida and Georgia. In *Leadingham v. Wallace*, 691 So.2d 1162 (Fla.Dist.Ct.App. 1997), the issue before the trial court was whether the decedent's ex-wife or ex-girlfriend had the right to be appointed the curator for the purpose of selecting where the decedent would be buried. The ex-girlfriend wished to bury him in Florida while the ex-wife wanted to bury him in West Virginia. *Id.* The trial court determined that the ex-girlfriend was entitled to the appointment as curator and she buried the decedent's remains in Florida while the case was pending on appeal. *Id.* at 1162-63. The appellate court rejected several arguments presented on appeal by the ex-wife but it also concluded that after burial has occurred, any further challenge for possession of the body is moot. *Id.* at 1163.

Bernal also cites *Tully v. Tully*, 177 S.E.2d 49 (Ga. 1970) in support of her contention that the third issue is moot. While the Tullys' divorce was pending, two of their children died in a house fire while visiting Ms. Tully. The Tullys disagreed where the children should be buried and Ms. Tully made arrangements to bury them in Georgia. *Id.* Mr. Tully obtained an ex parte restraining order to prevent Ms. Tully from going forward with the funeral but Ms. Tully, who was hospitalized as a result of injuries suffered in the fire, did not receive notice of the restraining order prior to interment of the children. *Id.* Afterward, Mr. Tully asked the trial court to determine the rights of the parties to the custody and burial of the children's remains. *Id.* The court dismissed the restraining order as moot, finding that the interment had been completed before Ms. Tully received notice of the order. *Id.* The trial court also held that Ms. Tully had the right to direct the funeral arrangements and burial. *Id.* Mr. Tully appealed. The appellate court concluded that the right of each parent to participate in the funeral arrangements was moot because interment had taken place. *Id.* at 50.

The probate court determined that Bernal had the right to dispose of the remains. The

Thorntons could have suspended the judgment pursuant to TEX.R.APP.P. 24.1, but they failed to do so. Consequently, they permitted Bernal to exercise the right to control disposition of the remains under Section 711.002, and Hemsley's remains were buried at Fort Bliss. We conclude that Bernal's exercise of the right effectively extinguished any right which the Thorntons might have had to control disposition of the remains. Even if we assume for the sake of argument that the Thorntons are correct that they, rather than Bernal, had the right to determine the disposition of the remains, our decision could not have any practical legal effect on the existing controversy because interment has already taken place. Accordingly, we conclude that Issue Three is moot and must be dismissed. Having overruled Issues One and Two, we affirm the judgment of the probate court.

November 12, 2014

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.
(Rivera, J., not participating)