**Opinion filed June 9, 2022**



In The

# Eleventh Court of Appeals

_____

## No. 11-20-00170-CV

_____

## IN THE MATTER OF THE ESTATE OF JAMES BOOKER HOGAN, DECEASED

**On Appeal from the County Court at Law**
**Brown County, Texas**
**Trial Court Cause No. PRB014208**

## MEMORANDUM OPINION

This is an appeal from a will contest between family members. Appellant contested the will on the grounds that his father lacked testamentary capacity when his will was executed and that Appellee, brother of Appellant, exerted undue influence over the testator. The trial court found that there was testamentary capacity and no undue influence. Appellant challenges the legal and factual sufficiency of those findings. We affirm.

*Background* [1]

On May 13, 2010, James Booker Hogan (Decedent) executed a self-proved last will and testament (the 2010 will). It was prepared by Decedent's attorney, witnessed by his paralegal and another attorney, notarized, and annexed to a self-proving affidavit signed by Decedent and the two witnesses. In doing so, Decedent revoked his prior will and devised all of his property to only one of his sons, Harold Edward Hogan (Appellee), thus disinheriting his other son, Gary E. Hogan (Appellant). The previous will had devised all of Decedent's property to Appellant and Appellee equally. No copy of the prior will was offered into evidence, and it was never offered for probate. Decedent had one other son, who predeceased Decedent but was survived by a daughter, Janae Hooker (Janae). Decedent also had a surviving daughter, from a prior marriage. The revoked will, like the 2010 will, disinherited his daughter and his granddaughter, Janae.

Decedent died on August 20, 2015. On September 21, 2017, Appellee applied to probate the 2010 will. On January 16, 2018, Appellant filed an opposition to Appellee's probate application, alleging that Decedent lacked testamentary capacity when he executed the 2010 will and that the will was the result of Appellee's undue influence over Decedent. A hearing was held on February 26, 2020. At the hearing, both parties testified, called witnesses, and offered evidence for the trial court's consideration. Appellee offered the self-proved 2010 will. Appellant offered medical records from 2011 which indicated that Decedent had Alzheimer's type dementia and lacked testamentary capacity in late 2011. Appellee and his girlfriend testified that Decedent was mentally competent in 2010 and that Appellee did not

---

[1]This appeal presents a challenge to the sufficiency of the evidence to support the trial court's findings. We confine our recitation of the facts in this section to a brief overview in order to minimize repetition since the facts are more fully discussed later in the analysis sections.

2

influence Decedent to make a new will. Appellant and his witnesses testified that Decedent was not mentally competent in 2010, recounting instances from unspecified time periods in which Decedent was forgetful, confused, or unable to recognize people he knew. Appellant presented no evidence of undue influence other than testimony that Appellee became something of a caretaker for Decedent after Decedent's wife died in 2009 and Janae's testimony that she saw Appellee escorting Decedent from his attorney's office.

The trial court found that the 2010 will offered for probate had been executed "with the formalities and solemnities and under the circumstances required by law to make it a valid Will, that was self-proved." Further, the trial court found that Decedent had the requisite testamentary capacity when he executed the 2010 will. The trial court also found that no evidence was presented to support a finding of undue influence. As such, the trial court overruled Appellant's objections, denied his contest, and admitted the 2010 will into probate. Appellant now challenges the legal and factual sufficiency of the trial court's findings.

*Standards of Review*

"A trial court's findings of fact issued after a bench trial have the same weight, and are judged by the same appellate standards, as a jury verdict." *Tex. Outfitters Ltd. v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019). When we review a trial court's factual determinations, we apply the same standards of review that we use in reviewing the evidence in support of a jury's findings. *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000) ("When the trial court acts primarily as a factfinder, appellate courts normally review its determinations under the legal and factual sufficiency standards." (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994))); *see also Burt v. Francis*, 528 S.W.3d 549, 553 (Tex. App.—Eastland 2016, no pet.). Under either standard, the trial judge is the sole judge of the credibility of witnesses and the

weight to be given their testimony. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *In re Estate of Scott*, 601 S.W.3d 77, 88 (Tex. App.— El Paso 2020, no pet.). When a party challenges both the legal and factual sufficiency of the evidence, appellate courts should decide the legal sufficiency issues first. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 369 (1960)).

To analyze a legal sufficiency challenge, we must determine whether the evidence presented would enable reasonable and fair-minded people to make the finding under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We review the evidence in the light most favorable to the finding, crediting any favorable evidence if a reasonable factfinder could and disregarding any contrary evidence unless a reasonable factfinder could not. *Id.* at 821–22, 827. If conflicting evidence can be resolved either way, we must presume the factfinder did so in favor of the prevailing party and disregard the conflicting evidence. *Id.* at 821.

When an appellant challenges the legal sufficiency of the evidence supporting an adverse finding on an issue for which the appellant did not bear the burden of proof, we sustain that challenge "if our review of the evidence demonstrates a complete absence of a vital fact, or if the evidence offered is no more than a scintilla." *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014). "More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach different conclusions." *Id.* (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)). However, "if the evidence is so weak that it only creates a mere surmise or suspicion," then that is legally equivalent to "no evidence." *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 156 (Tex.

4

2014).[2] When, on the other hand, an appellant attacks the legal sufficiency of an adverse finding on an issue for which the appellant bore the burden of proof, the appellant "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

When reviewing a factual sufficiency challenge, we "must consider and weigh all of the evidence," not just the evidence that supports the trial court's finding. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998). We must review the evidence in a neutral light. *Woods v. Kenner*, 501 S.W.3d 185, 196 (Tex. App.—Houston [1st Dist.] 2016, no pet.). When we set aside a judgment on the basis of factually insufficient evidence to support a vital finding, we must detail the evidence relevant to the issue and specify how the contrary evidence greatly outweighs the evidence in support of the finding. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). No such explanation is required when we affirm a judgment. *Thomas v. Uzoka*, 290 S.W.3d 437, 453 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (citing *Ellis*, 971 S.W.2d at 407).

When a party attacks the factual sufficiency of an adverse finding on an issue for which it had the burden of proof, it must demonstrate on appeal "that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co.*, 46 S.W.3d at 242 (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). When a party challenges the factual sufficiency of the evidence supporting a trial court's finding on an issue for which it did not have the burden of proof, we

___

[2]"The scintilla rule cannot apply where there is direct evidence of a vital fact; it applies only when the vital fact must be inferred from other relevant facts and circumstances which are proved. If the inference is not a reasonable one a 'no evidence' point should be sustained. It follows that 'no evidence' points based on the scintilla rule require a careful analysis of the facts proved for the purpose of determining whether the vital fact may be reasonably inferred." Calvert, 38 TEX. L. REV. at 363 (footnotes omitted).

will set aside the finding only if the evidence in support of the finding is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Cowan v. Worrell*, 638 S.W.3d 244, 253 (Tex. App.—Eastland 2022, no pet.); *see Pool*, 715 S.W.2d at 635; *In re Estate of Hemsley*, 460 S.W.3d 629, 637 (Tex. App.—El Paso 2014, pet. denied).

*Discussion*

I. *The evidence is legally and factually sufficient to support the trial court's finding that Decedent had testamentary capacity when he executed the 2010 will.*

A. *Applicable law*

1. *Burdens of persuasion and of production*

Before a will is admitted to probate, the will's proponent bears the burden of establishing that the testator had testamentary capacity at the time of its execution. *Croucher*, 660 S.W.2d at 57; *Neal v. Neal*, No. 01-19-00427-CV, 2021 WL 1031975, at *4 (Tex. App.—Houston [1st Dist.] Mar. 18, 2021, no pet.) (mem. op.); *Estate of Danford*, 550 S.W.3d 275, 281 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Hemsley*, 460 S.W.3d at 634. The proponent of the will may make a prima facie case that the testator had testamentary capacity by introducing a self-proved will into evidence. *Neal*, 2021 WL 1031975, at *4; *see also* TEX. EST. CODE ANN. § 251.101(1) (West 2020) (defining self-proved wills). The burden of *production* then shifts to the contestant to put forward evidence that negates testamentary capacity. *Neal*, 2021 WL 1031975, at *4; *Danford*, 550 S.W.3d at 281. The burden of *persuasion*, however, always remains with the will's proponent. *Neal*, 2021 WL 1031975, at *4; *Danford*, 550 S.W.3d at 281. In short, a self-proved will does not relieve the proponent of their burden of proving that the testator had testamentary capacity when the will was executed. *Croucher*, 660 S.W.2d at 57; *In re Estate of*

6

*Graham*, 69 S.W.3d 598, 605–06 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.).

### 2. *Testamentary capacity*

A testator has testamentary capacity when he is able to understand that he is making a will, the effect of making the will, and the general nature and extent of his property. *Estate of Luce*, No. 02-17-00097-CV, 2018 WL 5993577, at *8 (Tex. App.—Fort Worth Nov. 15, 2018, no pet.) (mem. op.); *Hemsley*, 460 S.W.3d at 634. The testator must also know his family, the natural objects of his bounty and the claims upon them. He must possess sufficient memory to collect in his mind the elements of the business transacted and hold them long enough to perceive their obvious relation to one another and to form a reasonable judgment about them. *Luce*, 2018 WL 5993577, at *8; *Hemsley*, 460 S.W.3d at 634.

The key question is whether the testator had testamentary capacity *at the time that he actually executed the will. See Neal*, 2021 WL 1031975, at *4; *Danford*, 550 S.W.3d at 281; *Luce*; 2018 WL 5993577, at *8; *Hemsley*, 460 S.W.3d at 634. But evidence about the testator's state of mind at other times can be used to prove his state of mind when he executed the will if it demonstrates a *persistent* condition affecting his competency that was probably present at the time he executed the will. *Croucher*, 660 S.W.2d at 57; *Hemsley*, 460 S.W.3d at 634; *In re Estate of Pilkilton*, No. 05-11-00246-CV, 2013 WL 485773, at *4 (Tex. App.—Dallas Feb. 6, 2013, no pet.) (mem. op.). This may be inferred from the testimony of lay and expert witnesses concerning their observations of the testator's conduct prior or subsequent to the execution of the will. *Neal*, 2021 WL 1031975, at *4; *Danford*, 550 S.W.3d at 281.

7

B. *Analysis*

Appellant challenged the 2010 will before it was admitted to probate, so the burden of proof at trial was on Appellee to prove that Decedent had testamentary capacity at the time he executed it. *See Croucher*, 660 S.W.2d at 57; *Neal*, 2021 WL 1031975, at *4; *Danford*, 550 S.W.3d at 281; *Hemsley*, 460 S.W.3d at 634. The 2010 will is self-proved because there is annexed to it a self-proving affidavit, subscribed and sworn to by Decedent and two impartial witnesses. *See* EST. §§ 251.101(1), .104(e) (defining self-proving affidavits). As such, Appellant then had the burden of producing evidence showing that Decedent did not have testamentary capacity at the time that he executed the 2010 will. *See Neal*, 2021 WL 1031975, at *4; *Danford*, 550 S.W.3d at 281. The ultimate burden of persuasion, however, remained with Appellee. *See Neal*, 2021 WL 1031975, at *4; *Danford*, 550 S.W.3d at 281.

Appellant's effort to satisfy his burden of production included offering Decedent's medical records from 2011 and testimony from witnesses who testified that Decedent did not know his property, did not recognize his family, and was often forgetful and disoriented.

1. *Legal Sufficiency—a self-proved will*

The evidence supporting the trial court's adverse finding that Decedent had the requisite testamentary capacity is legally sufficient so long as there is more than a scintilla of evidence to support it. *See Burbage*, 447 S.W.3d at 259. Appellee argues that the evidence is legally sufficient by mere virtue of the 2010 will being self-proved. We disagree.

When a self-proved will is admitted into evidence, as it was here, the proponent has established a "prima facie case" that the testator had testamentary capacity. *See Neal*, 2021 WL 1031975, at *4; *Danford*, 550 S.W.3d at 281. A

8

"prima facie case" is a legal term of art that specifically means the "minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true." *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015) (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004)). It refers to "evidence sufficient as a matter of law to establish a given fact *if it is not rebutted or contradicted*." *Id.* (emphasis added). Because the will was self-proved, the burden of production shifted to Appellant, and he satisfied his burden of producing some evidence to contradict or negate the existence of testamentary capacity. The self-proved will cannot be "sufficient as a matter of law to establish" that Decedent had testamentary capacity once Appellant rebutted or contradicted that fact. *See id.* We must look further than the bare fact of self-proof, by itself, to find a legally sufficient quantum of evidence that Decedent had testamentary capacity when he executed the 2010 will.

The details surrounding the self-proved will are important and may constitute additional persuasive evidence that the will had been properly executed and that the testator knowingly intended its legal effect. Here, the 2010 will was prepared by an attorney and was witnessed by his paralegal and an attorney associate, all of whom the trial court could consider to be comparatively well-equipped to observe and determine whether a testator has testamentary capacity. Moreover, the trial court, as finder of fact and sole judge of credibility, was entitled to believe that a self-proved will prepared and witnessed by legal professionals has probative value over and above a self-proved will in which no details are known beyond the bare fact that it is self-proved. *In re Neville*, 67 S.W.3d 522, 527 (Tex. App.—Texarkana 2002, no pet.). Even Appellant admitted, on cross-examination, that he was personally familiar with the attorney who prepared the 2010 will and that the attorney would

9

not have allowed Decedent to execute it if he believed that Decedent lacked the testamentary capacity to do so.

Accordingly, the details about *who* prepared the 2010 will and *how* it was self-proved, as well as Appellant's own testimony that he did not believe Decedent's attorney would have permitted Decedent to execute the 2010 will in an incapacitated state, amount to more than a scintilla of evidence. Therefore, the evidence was legally sufficient to demonstrate that Decedent actually had testamentary capacity when he executed the 2010 will.

## 2. *Factual Sufficiency*

The parties presented competing evidence concerning whether Decedent had testamentary capacity when he executed the 2010 will. We must view all of that evidence in a neutral light and determine whether the evidence in support of the finding is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *See Cowan*, 638 S.W.3d at 253; *see also Hemsley*, 460 S.W.3d at 637. We conclude that it is not.

Appellant introduced medical records prepared by Amy Tindol, M.D. The dates of examination are important relative to the will's execution. The will was executed in May 2010, and it was not until over a year later, in August 2011, that Dr. Tindol conducted a medical evaluation of Decedent, describing him as "an elderly gentleman with a history of underlying dementia which has become increasingly severe." In November 2011, Dr. Tindol wrote a letter describing Decedent as suffering from "a history of Alzheimer's type dementia" and stating that Decedent's "decision making has become increasingly impaired in the last several years." In that letter, Dr. Tindol concluded that Decedent was not "competent of making legal or financial decisions *at present* (emphasis added)." While these records demonstrate that Decedent suffered from a gradual onset of dementia to

some degree for several years before Dr. Tindol declared him to be incompetent to make legal or financial decisions, Appellant conceded in his testimony that there are no medical records indicating that Decedent was incapacitated or incompetent when he executed the will in May 2010. He also conceded that Dr. Tindol did not issue the letter declaring Decedent incompetent to make legal or financial decisions until November 2011, nearly eighteen months after Decedent executed the 2010 will.

Appellee testified that in May 2010, Decedent knew who Appellee and Appellant were. He testified that, while Decedent's mind "started vanishing away . . . he still knew who we were." He testified that he did not believe Decedent had dementia or Alzheimer's disease until 2012, at which point he was moved into a nursing home. Appellee admitted that Decedent was forgetful and took medicine for dementia before he was ever moved into the nursing home. Appellee's girlfriend, Carla Jones (Carla), testified that, after Decedent's wife died in 2009 but before he moved into the nursing home in 2012, she began checking on him two to three times a day. She testified that, during those years, Decedent knew what he was doing, recognized the people with whom he interacted, knew his family members and his natural heirs, and knew what property he owned. Carla also admitted that Decedent "beg[a]n to slip a little bit mentally" but testified that this did not occur until late 2011 or early 2012.

To the contrary, Appellant testified that by the time Decedent executed the 2010 will, he was already suffering from dementia and would occasionally call Appellant on the phone but believed he was talking to someone else. Appellant described another instance when he received a phone call from an acquaintance who observed Decedent drive his truck to a park, exit the truck, and leave the park on foot. And on another occasion, Appellant testified that he received a phone call when an acquaintance observed Decedent driving on the wrong side of the road.

11

When asked whether he believed Decedent had sufficient memory in 2010 to make and understand a will, Appellant answered: "No way."

Appellant's wife, Jenell Paul Hogan (Jenell), testified about an incident when she was a passenger in Decedent's truck and he began to drive on the wrong side of the road. She said that he corrected, parked and exited the truck, and said: "I think we need to turn back." She further testified that she did not believe Decedent was mentally aware of his property, explaining that his late wife always handled all of his financial decision-making for him. However, when asked whether she could recall any instances in which Decedent was unable to remember close family members or recognize her, Jenell testified that "he didn't see me daily" but "[h]e knew who I was."

Jermaine Hays (Jermaine), a friend of Decedent's, testified about one evening in 2006 or 2007 when he found Decedent sitting in his truck at a park for an unusual amount of time. When he went to check on Decedent, Decedent seemed disoriented and confused, so Jermaine had Decedent move to the passenger seat and then drove him home in his truck. Jermaine testified that he even had to coax Decedent to go inside his house after some time had passed and Decedent had not left his front porch. When asked whether Decedent responded to him by name, Jermaine said no, "but he knew who I was. . . . [H]e reached for my shoulder . . . [and] said, 'Hey,' like . . . he knew me."

Tony Edwin Jones (Tony), Decedent's wife's cousin, testified about an instance when he saw Decedent at a barbeque. He said Decedent became confused and disoriented so Tony drove him home.[3] However, he also testified that Decedent never forgot who Tony was or failed to recognize him.

---

[3]In large part, the specific instances referenced by Appellant and his witnesses related to the ability to drive and did not include specific time frames in relation to the 2010 will execution.

Only one witness testified that Decedent failed to recognize them: Decedent's granddaughter, Janae. Janae, as the trial court noted, "probably has the most to gain of anybody" if the 2010 will were not entered into probate and Decedent's property was, instead, distributed under the laws of intestate succession. Janae was not included in either Decedent's original will or the 2010 will. She testified that Decedent's memory had already begun to deteriorate before his wife's death in 2009 but that it became notably worse afterward. She testified that Decedent was often unable to recognize her or her children. She also testified that Decedent's house was often full of notes to remind Decedent of things he might otherwise forget.

The pivotal question in a case like this is not whether Decedent had episodic dementia, was periodically unable to drive, or lacked testamentary capacity a year after executing his will, but whether he had testamentary capacity "at the time the will was executed." *See Hemsley*, 460 S.W.3d at 634. Evidence of dementia before and after a will is executed can be used to prove that Decedent lacked testamentary capacity only if it demonstrates a *persistent* condition that probably affected his competency when he executed the 2010 will. *Croucher*, 660 S.W.2d at 57; *Hemsley*, 460 S.W.3d at 634; *Pilkilton*, 2013 WL 485773, at *4. That type of evidence is not in the record before us. Nevertheless, the evidence in the record does support the conclusion that Decedent was regularly lucid at least pre-2011. Further, Appellant presented no evidence that Decedent was not lucid when he executed the 2010 will before two persons with an established legal background who witnessed its execution and swore on their oath that Decedent was of sound mind when he did so.

When there is conflicting evidence in the record, as there is here, "the trier of fact is entitled to accept or reject any testimony, resolve conflicts in the testimony, and decide the weight to be given to the testimony." *Neville*, 67 S.W.3d at 527. The trial court, as the trier of fact, explicitly found that Janae lacked credibility, and we

must defer to the trial court's determination on such matters. For these reasons, we cannot say that the evidence supporting the finding of testamentary capacity was weak or that the trial court's finding of testamentary capacity was contrary to the overwhelming weight of the evidence, let alone *so* contrary as to be clearly wrong and manifestly unjust. Accordingly, we hold that the evidence is factually sufficient to support the trial court's finding that Decedent had testamentary capacity when he executed the 2010 will. As such, we overrule Appellant's first issue.

II. *The evidence is legally and factually sufficient to support the trial court's finding that Appellee exerted no undue influence over Decedent.*

### A. *Applicable Law*

#### 1. *Shifting burdens of persuasion and production*

The party contesting a will generally bears the burden of proving undue influence. *See Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963); *Neal*, 2021 WL 1031975, at \*8; *Danford*, 550 S.W.3d at 281; *Pilkilton*, 2013 WL 485773, at \*11. But if the contestant introduces evidence of a confidential or fiduciary relationship between the testator and the proponent, a presumption of undue influence arises and the proponent must produce evidence showing an absence of undue influence. *Neal*, 2021 WL 1031975, at \*9; *Danford*, 550 S.W.3d at 281. This is a rebuttable presumption that only shifts the burden of production; the burden of persuasion remains with the party contesting the will. *Neal*, 2021 WL 1031975, at \*9; *In re Estate of Grogan*, 595 S.W.3d 807, 818 (Tex. App.—Texarkana 2020, no pet.). If the proponent introduces evidence contradicting the presumption, "the presumption is extinguished, and the case proceeds as if no presumption ever existed." *Neal*, 2021 WL 1031975, at \*10.

#### 2. *Fiduciary relationships*

"There are two types of fiduciary relationships in Texas: (1) a formal fiduciary relationship arising as a matter of law . . . and (2) an informal or confidential

fiduciary relationship arising from a moral, social, domestic, or merely personal relationship where one person trusts in and relies upon another." *Gray v. Sangrey*, 428 S.W.3d 311, 316 (Tex. App.—Texarkana 2014, pet. denied) (citing *Crim Truck & Tractor v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992), *superseded by statute on other grounds as stated in Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225–26 (Tex. 2002)).

### 3. *Undue influence—elements and determining factors*

Absent a presumption of undue influence—or in the event that the proponent of the will rebuts such a presumption—the contestant must prove: (1) the existence and exertion of an influence (2) that subverted or overpowered the testator's mind when he executed the will, (3) such that he executed a will that he would not have otherwise executed but for the influence. *Rothermel*, 369 S.W.2d at 922; *Pilkilton*, 2013 WL 485773, at *11. Not every influence amounts to undue influence. *Rothermel*, 369 S.W.2d at 922. Indeed, "one may request or even importune and entreat another to execute a favorable dispositive instrument; but unless the importunities and entreaties are shown to be so excessive as to subvert the will of the maker," there is no undue influence. *Id.*

The presence of undue influence "is usually a subtle thing and by its very nature usually involves an extended course of dealings and circumstances[,]" and it may be proved by circumstantial evidence. *Id.* The circumstances relied on as establishing undue influence must be of a reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of such influence. *In re Kam*, 484 S.W.3d 642, 652 (Tex. App.—El Paso 2016, pet. denied).

15

We consider ten non-exhaustive factors when determining whether undue influence exists. *See Rothermel*, 369 S.W.2d at 923. The first five factors concern whether the proponent exerted any influence over the testator, considering:

(1) the nature and type of relationship between the testator, contestant, and proponent;

(2) the opportunities existing for the exertion of the type of influence or deception possessed or employed;

(3) the circumstances surrounding the drafting and execution of the will;

(4) the existence of a fraudulent motive;

(5) whether there has been habitual subjection of the testator to the control of another.

*Rothermel*, 369 S.W.2d at 923; *Kam*, 484 S.W.3d at 652; *Graham*, 69 S.W.3d at 609. The next four factors are used to determine whether the testator's will was subverted or overpowered by any influence exerted by the proponent, considering:

(6) the state of the testator's mind at the time he executed the will;

(7) the testator's mental or physical incapacity to resist such influence or the susceptibility of the testator's mind to the type and extent of influence exerted;

(8) the words and acts of the testator;

(9) the testator's weakness of mind and body, whether a result of age, disease, or otherwise.

*Rothermel*, 369 S.W.2d at 923; *Kam*, 484 S.W.3d at 652; *Graham*, 69 S.W.3d at 609. Finally, the tenth factor is relevant to determining whether the will would have been executed in the absence of the influence exerted by the proponent, considering:

(10) whether the will executed is unnatural in its disposition of the testator's property.

*Rothermel*, 369 S.W.2d at 923; *Kam*, 484 S.W.3d at 652; *Graham*, 69 S.W.3d at 609.

### B. *Analysis*

Appellant, as contestant of the 2010 will, had the burden of proving undue influence. *See Rothermel*, 369 S.W.2d at 922; *Neal*, 2021 WL 1031975, at *8;

*Danford*, 550 S.W.3d at 281; *Pilkilton*, 2013 WL 485773, at \*11.   However, Appellant may have shifted the burden of *production* by presenting evidence of a confidential fiduciary relationship existing between Appellee and Decedent, thereby raising a presumption of undue influence.  *See Neal*, 2021 WL 1031975, at \*9; *Danford*, 550 S.W.3d at 281.[4]  Appellant argues that such a confidential fiduciary relationship existed because the evidence at trial demonstrated that Appellee was Decedent's caretaker.  The trial court made no findings regarding any form of fiduciary relationship with Decedent.

Appellee testified that, after his mother's death, he became Decedent's "only caretaker[,]""cooked and assisted him, made sure he was eating[,]""cut his hair," and "made sure he took his medicine every day."  Additionally, Appellee's girlfriend, Carla, testified that she visited Decedent two to three times each day and that she "cooked" and "cleaned" and "took care of him."  If we assume without finding that a presumption of undue influence arose, then Appellee was required to produce evidence to contradict it.  But once Appellee, as proponent, produces evidence contradicting the presumption, "the presumption is extinguished, and the case proceeds as if no presumption ever existed." *Neal*, 2021 WL 1031975, at \*9.

Here, Appellee produced evidence that rebutted a presumption of undue influence that might have been raised from his caretaker relationship with Decedent. Appellee and Carla both testified that they were unaware that Decedent was making a new will in 2010 or that he had any intentions to do so.  Appellee testified that Decedent was still living alone and driving on his own in May 2010 and that Appellee was unaware that Decedent had gone to see his lawyer, Dana Smith, on the 13th of that month.   Appellee further testified that he never discussed

---

[4]The burden of persuasion always remains with the party contesting the will.  *Neal*, 2021 WL 1031975, at \*9; *Grogan*, 595 S.W.3d at 818.

Decedent's will with him. Appellee and Carla both testified that Appellee never coerced or persuaded Decedent to change his will. This evidence was not rebutted by Appellant. In fact, in closing argument, trial counsel for Appellant frankly stated, "I do not dispute Counsel's assertion that we have not put evidence of undue influence on, and we just didn't have it to put on. . . . [W]e didn't have any evidence of that, and I didn't waste the Court's time trying to prove that up."

Appellee satisfied his burden of producing evidence rebutting, and thereby extinguishing, any presumption of undue influence. *Id.* Therefore, we proceed as if there was no such presumption in the first place. *Id.* Consequently, Appellant's legal and factual sufficiency complaint challenges an adverse finding on an issue (undue influence) for which he had the burden of proof at trial.

### 1. *Legal Sufficiency*

Because Appellant, therefore, had the burden of proof at trial, he "must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of [undue influence]." *Dow Chem. Co.*, 46 S.W.3d at 241. To prevail on his legal sufficiency challenge, the evidence in the record must establish, as a matter of law, (1) the existence and exertion of an influence (2) that subverted or overpowered Decedent's mind when he executed the 2010 will, (3) such that he executed a will that he would not have otherwise executed but for the influence. *Rothermel*, 369 S.W.2d at 922; *Pilkilton*, 2013 WL 485773, at *11. If the evidence fails to establish one of these elements, Appellant's challenge must fail.

Appellant presented some evidence supporting the existence of an influence in that Appellee was Decedent's caretaker and he and Carla had frequent contact with Decedent. By comparison, Appellant only saw Decedent "two times a year." However, Appellant presented no evidence that Appellee had any fraudulent motive or that Appellee had habitually subjected Decedent to his control. *See Rothermel*,

369 S.W.2d at 923; *Kam*, 484 S.W.3d at 652; *Graham*, 69 S.W.3d at 609. Appellant presented evidence through Janae, who claimed that she had observed Decedent and Appellee leaving Dana Smith's office together. But Janae also conceded that she had no idea what day, month, or year it was when the purported observation took place, and the trial court, as the finder of fact, explicitly found that Janae was not a credible witness, a judgment to which we owe the utmost deference. More importantly, when asked whether anyone pressured Decedent to change his will, Appellant himself testified that "nobody instigated him to do that will." *See City of Keller*, 168 S.W.3d at 821–22, 827 (explaining that we cannot disregard contrary evidence if a reasonable factfinder could not).

In short, even when viewed in the light most favorable to Appellant, the evidence only establishes that there was an *opportunity* for Appellee to exert an influence over Decedent. We "cannot infer the exertion of undue influence based on opportunity alone." *Neal*, 2021 WL 1031975, at *9; *see also Scott*, 601 S.W.3d at 90 (explaining that "the fact that an individual had the opportunity to influence the testator, such as by being the testator's caregiver, is insufficient to establish undue influence"). Indeed, "having an opportunity to exert such influence due to being in a position of caring for the person upon whom the influence is supposed to be exerted is equally consistent with the theory of innocence as it is with the theory of wrongdoing." *Rothermel*, 369 S.W.2d at 923. Thus, Appellant has failed to show that the evidence established the existence and exertion of an influence as a matter of law.

### 2. *Factual Sufficiency*

When a party attacks the factual sufficiency of an adverse finding on an issue for which it had the burden of proof, it must demonstrate on appeal "that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem.*

*Co.*, 46 S.W.3d at 242. As we have noted above, Appellant failed to demonstrate more than a mere opportunity for Appellee to exert an influence over Decedent. Thus, the trial court could not have found that there was undue influence. *See Rothermel*, 369 S.W.2d at 923; *Neal*, 2021 WL 1031975, at *9. The trial court's finding that there was no undue influence simply cannot be against the great weight and preponderance of the evidence, since a finding that Appellee even exerted an influence—ignoring the further questions of whether Decedent succumbed to the influence and whether the result was a will that would not have existed but for the influence—has no support in the record.

We further note that the evidence also fails to support the third element necessary to prove undue influence: that the result was a will that Decedent would not have made but for the exertion of an influence. In determining whether a testator made a will he would not have made absent undue influence, we consider whether the will makes an unnatural disposition of the testator's property. *Rothermel*, 369 S.W.2d at 923; *Kam*, 484 S.W.3d at 652; *Graham*, 69 S.W.3d at 609. Appellant argued at trial that it was an unnatural disposition of Decedent's property for him to change his will—which previously devised all property in equal shares to both Appellant and Appellee—such that only Appellee received anything. A situation in which a testator prefers one close relative over another "is frequently present in cases involving the issue of undue influence, and it is only where all reasonable explanation . . . for the devise is lacking that the trier of facts may take this circumstance as a badge of disorder or lapsed mentality or of its subjugation." *Rothermel*, 369 S.W.2d at 923–24. Here, the trial court credited other reasonable explanations.

The evidence in the record shows that Appellant rarely had contact with Decedent, while Appellee and his girlfriend saw Decedent on a weekly and daily

basis, respectively, and took care of him in many ways. It may simply be that Decedent wanted to bequeath all of his property to the son who was present in his life and supported him. Additionally, evidence presented at trial demonstrated that the Decedent's prior will, by devising everything to Appellant and Appellee in equal shares, disinherited his daughter and his granddaughter by a predeceased son. It is reasonable to conclude that the 2010 will was not the first time Decedent had considered and decided upon disinheriting a child. In that context, the 2010 will's disposition is not unnatural or unusual.

For all of these reasons, the great weight and preponderance of the evidence does not support a finding that Appellee exerted an influence over Decedent. Nor does the great weight and preponderance of the evidence support a finding that the 2010 will made an unnatural disposition of Decedent's property. We cannot say then, that the trial court's finding that Decedent did not execute his will under undue influence is against the great weight and preponderance of the evidence. Accordingly, we overrule Appellant's second issue.

*This Court's Ruling*

We affirm the order of the trial court.


W. BRUCE WILLIAMS
JUSTICE


June 9, 2022

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.